**GLANCY PRONGAY & MURRAY LLP**
Lionel Z. Glancy (#134180)
Robert V. Prongay (#270796)
Lesley F. Portnoy (#304851)
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Tel.: (310) 201-9150
Fax: (301) 201-9160
Email: lglancy@glancylaw.com
rprongay@glancylaw.com
lportnoy@glancylaw.com

***Liaison Counsel for Lead Plaintiff and the Class***
[Additional counsel listed on signature page]

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| NANCY SCHWARTZ, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>OPUS BANK, STEPHEN H. GORDON, and MICHAEL L. ALLISON,<br><br>Defendants. | Case No. 2:16-cv-07991-AB-JPR<br><br>**AMENDED CLASS ACTION COMPLAINT** |

## TABLE OF CONTENTS


I. NATURE AND SUMMARY OF THE ACTION ..... 1

II. JURISDICTION AND VENUE ..... 6

III. PARTIES ..... 7

IV. SUBSTANTIVE ALLEGATIONS ..... 11

A. Background ..... 11

B. Defendants Falsely Assure Investors of Opus' Conservative Approach to Credit and Stringent and Disciplined Underwriting ..... 13

C. Defendants Failed to Disclose that Opus' Lacked The Ability to Monitor its Loan Portfolio and to Establish Appropriate Reserves for Loan Losses ..... 15

D. Confidential Witness Allegations ..... 17

E. False and Misleading Statements and Omissions ..... 27

F. The Truth Begins to Emerge ..... 66

G. Post Class Period Developments ..... 80

V. ADDITIONAL SCIENTER ALLEGATIONS ..... 82

A. Allison's Insider Trading During the Class Period Is Indicative of Scienter ..... 83

B. The Use of Opus Common Stock as Currency in Two Acquisitions During the Class Period Is Indicative of Scienter ..... 83

C. Gordon's and Allison's Prior Experience in the Banking Industry Is Indicative of Scienter ..... 84

VI. LOSS CAUSATION ..... 85

VII. APPLICABILITY OF PRESUMPTION OF RELIANCE – FRAUD ON THE MARKET DOCTRINE ..... 86

VIII. NO SAFE HARBOR ........................................................................................ 87

IX. CLASS ACTION ALLEGATIONS ........................................................................ 88

X. COUNTS ........................................................................................ 90

XI. PRAYER FOR RELIEF ........................................................................................ 91

XII. JURY TRIAL DEMANDED ........................................................................................ 92

Lead Plaintiff Arkansas Public Employees Retirement System ("APERS" or "Lead Plaintiff"), individually and on behalf of all other persons similarly situated, alleges the following against Opus Bank ("Opus" or the "Bank"), its current Chairman of the Board and Chief Executive Officer ("CEO") Stephen H. Gordon ("Gordon"), and the former Co-President of the Bank and former President of the Commercial Bank Michael L. Allison ("Allison") (Opus, Gordon, and Allison are referred to collectively as "Defendants"; Gordon and Allison are referred to collectively as the "Individual Defendants.") Lead Plaintiff makes these allegations based upon the investigation of its counsel which included a review, among other things, of Federal Deposit Insurance Corporation ("FDIC") filings; other regulatory filings and reports; securities analysts' reports and advisories about the Company; news and media reports published about the Company; interviews with witnesses; and consultations with an expert. Lead Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I. <u>NATURE AND SUMMARY OF THE ACTION</u>

1. This is a securities class action on behalf of purchasers of the common stock of Opus between January 26, 2015 and January 30, 2017, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act"). As detailed herein, Defendants repeatedly represented during the Class Period that Opus had a disciplined and conservative approach to the extension of credit, stringent underwriting standards, and robust credit controls in place. Further, Defendants repeatedly stated that Opus had appropriate personnel, resources, systems and procedures in place to monitor and report to the investing public the true status of its loan portfolio and, in particular, to establish proper loss reserves for its loan portfolio including loans made by Opus' Commercial Bank Division. These statements, however, were false and misleading at the time they were made.

2. Opus is a publicly chartered commercial bank, headquartered in Irvine, California. The Bank was founded by Gordon, its current CEO, in 2010, and went public in April 2014, raising $80.3 million in its initial public offering ("IPO"). Following the IPO, Opus common stock was listed on the NASDAQ under the ticker symbol OPB. As of December 31, 2016, Opus had 56 banking offices located in major metropolitan markets within California, Washington, Oregon, and Arizona.

3. During the Class Period, Opus saw rapid growth in its Commercial Bank, which included the Technology Banking, Healthcare Banking, and Corporate Finance Banking units, among others. As the Commercial Bank grew, Opus' originated loan portfolio shifted from relatively safe multifamily real estate loans to riskier commercial loans and Defendants repeatedly assured investors that Opus had a strong credit culture, a conservative approach to credit, stringent underwriting standards, and robust credit controls, including portfolio monitoring, in place, and investors were assured that the sudden growth in the Commercial Bank was occurring in a disciplined and prudent credit environment. During the Class Period, Opus' stock price soared, reaching a Class Period high of $39.88 and remaining above its $30 initial public offering price.

4. The truth, however, was that Opus' growth was anything but disciplined and its credit culture was far from conservative. As one former employee explained, there was no credit culture at all; instead it was the "Stephen Gordon culture." Employees felt enormous pressure from Gordon to close loans at any cost. One former employee described this policy as "grow or die." The consequence of this was that Opus repeatedly disregarded or deviated from its underwriting standards and guidelines and extended credit that presented the Bank with vastly greater risk than would have been the case had the standards and guidelines been followed. The investing public was told none of this.

5. As detailed herein, former employees describe how Opus routinely deviated from its lending and loan underwriting standards through the repeated use of exceptions

and overrides. Opus' underwriting was not stringent – indeed, the Bank made numerous loans to companies that had little to no cash flow. Beginning in or around the fourth quarter of 2014, the Bank began ramping up "enterprise value loans" (synonymous with cash flow lending[1]) to companies that had not yet achieved positive cash flows. Moreover, according to witnesses, Defendants, and Gordon specifically, would deviate from formal credit authorization processes in order to close loans and would ignore warning signs of troubled loans.

6. Defendants knew or recklessly disregarded that their aggressive credit culture and risky underwriting practices rendered false and misleading their public statements assuring investors of the careful and conservative credit practices of the Bank. The truth was that Defendants were inundated with information demonstrating the poor and deteriorating credit quality and dangerous risk level of Opus' loan portfolio. The Bank's own public filings confirm that it and its senior management had access to and were well-aware of the very information that revealed these serious problems. For example, (1) Defendants received "monthly loan monitoring reports" that contained "a variety of loan portfolio metrics and highlight[ed] existing or potential issues" within the portfolio; (2) the Bank conducted semi-annual stress tests on the entire loan portfolio; (3) the Bank conducted regular reviews of its loan portfolio to monitor "compliance with loan covenants and determine appropriate loan risk rating"; and (4) the Bank "actively monitors loans that management believes indicate additional potential credit risk." Further, former employees detail quarterly credit review meetings

---

[1] Cash-flow lending is a form of financing in which a loan is backed by a company's expected cash flows. This differs from an asset-backed loan, where the collateral for the loan is based on the company's assets. Repayments for cash-flow loans are based on the company's projected future cash flows.

attended by the Chief Credit Officer, members of the Special Credits group,[2] all unit Credit Administrators, and portfolio analysts, during which the Bank's loan portfolio was discussed. Further, Problem Loan Reports ("PLRs") were reviewed by Allison, and Defendants could easily access a "risk rating report" that contained the risk rating of all of the Bank's loans via a software system called CreditQuest. Accordingly, Defendants were well aware of the true condition of the Bank's loan portfolio throughout the Class Period.

7. In addition, because Defendants knew Opus' loan portfolio was filled with highly risky loans through their receipt of these various reports, Opus was required to increase the Bank's reserves for loan losses in accordance with its own guidelines and Generally Accepted Accounting Principles ("GAAP"). However, Defendants failed to do so, belatedly disclosing to investors that the Bank had material weaknesses in its internal controls related to inadequate review of the allowance for loan losses, and admitting that the weaknesses were caused by unqualified and poorly trained personnel who were responsible for reviewing impaired loans.

8. Eventually, Opus could no longer conceal its crumbling loan portfolio, and the truth began to partially emerge. On October 17, 2016, prior to the market's open, Opus announced loan charge-offs of $38.8 million related to eight loans in the Commercial Bank. Following this partial corrective disclosure, Opus' stock price dropped 7% before the market opened, opening at $32 per share, down from the prior trading day's closing price of $34.45. Opus' stock plummeted an additional 15% over the course of the trading day, closing at $27.20 on volume of nearly 1.5 million shares.

9. But the full magnitude of Opus' undisclosed problems still had not been communicated to the investing public. On October 19, 2016, Opus held a "listen only"

---

[2] As explained in the Bank's public filings, the Special Credits group "focused on successfully managing and exiting problem loans to achieve the highest possible return."

conference call with investors to address the charge-offs. During that call Opus made further limited disclosures about the cause of the charge-offs, explaining that all eight loans had become collateral-dependent and that the shortfall between the value of the collateral securing the loan and the loan balance triggered the charge-offs. Further, the Bank disclosed that it would overhaul its credit controls in response to the charge-offs by bifurcating the role of Chief Credit Officer, lowering the Bank's in-house maximum hold limits, and lowering approval authority levels. Following that call, Opus' stock price dropped 12%, closing at $24.12 on volume of 1.3 million shares.

10. On October 24, 2016, Opus continued to give investors limited additional information about its true state of affairs at the Bank. Prior to market open, the Bank issued a press release stating that the charge-offs would result in a net loss of $.09 per diluted share, four cents higher than the Bank previously disclosed, due to the Bank increasing specific reserves for loan losses. In response to the press release, the Bank's stock dropped an additional 20% from the prior day's close of $23.16, opening at $18.50. After the market opened, the Bank held an earnings call during which Defendants assured investors that despite the bumpy quarter the Bank was implementing enhanced credit controls to improve performance going forward. In response to Defendants' positive statements about improving Opus' credit controls, the stock price climbed slightly in intraday trading, but ultimately closed at $21.29, down 8% from the prior day's close, on volume of nearly 1.5 million shares.

11. Then, in its quarterly report on Form 10-Q for the third quarter of 2016, filed on November 9, 2016, Opus disclosed that, contrary to its prior representations to the investing public, Opus in fact had material weaknesses in internal controls over financial reporting related to inadequate review of the allowance for loan losses on impaired loans during the fourth quarter of 2016. Following this disclosure, Opus' stock price dropped 1.36% from $21.29 to $21.00, on volume of 402,000 shares.

Despite this disclosure, Opus still had not fully disclosed the true state of affairs to its investors.

12. Finally, on January 30, 2017, Opus announced that the its fourth quarter 2016 earnings were impacted by a $69.5 million provision for loan losses which included additional loan charge-offs of $19.2 million. Opus disclosed that the charge-offs were a result of deterioration in the Technology Banking unit, Healthcare Banking unit, and Corporate Finance Banking unit's portfolios and that the deterioration was concentrated in enterprise value loans. Opus further announced that it would stop originating enterprise value loans and would no longer fund loans in the Healthcare Banking unit "Professional Practice" group[3] of its Commercial Bank for the foreseeable future. The market was stunned by this disclosure. Analysts following the Bank noted their surprise, with an analyst from JMP Securities explaining that the "bear case" for the fourth quarter occurred, "as credit was much worse than expected." In response to this news, Opus' stock price plummeted, closing at $20.40, a 14.8% decline from the day's opening price of $23.95 and a 25% decline from the prior day's closing price of $27.25 on volume of 1.9 million shares

## II. <u>JURISDICTION AND VENUE</u>

13. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

14. This Court has jurisdiction over the subject matter of the federal securities claims pursuant to 28 U.S.C. §§ 1331 and 1337 and Section 27 of the Exchange Act.

15. Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b). Opus is headquartered in this District and many of the acts that constitute the violations of law complained of herein, including dissemination of

[3] As described further in paragraph 27, the Healthcare Banking unit included two groups, a "Professional Practice" and a "Healthcare Provider" group.

materially false and misleading information to the investing public, occurred in and/or were issued from this District.

In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## III. PARTIES

16. Lead Plaintiff **Arkansas Public Employees Retirement System** is a multi-employer defined benefit retirement plan for state of Arkansas employees and was established in 1957. During the Class Period, Lead Plaintiff purchased 92,628 shares of Opus common stock and lost more than $880,000 as a result of such purchases, as set forth in APERS' certification previously filed with the Court.

17. Defendant **Opus Bank** is a publicly traded California-chartered commercial bank headquartered in Irvine, California. The Bank was founded by Gordon on September 30, 2010. As of December 31, 2016, the Bank had 56 banking offices located in major metropolitan markets within California, Washington, Oregon, and Arizona. Opus offers a wide variety of loan products to its clients, who include small and mid-sized companies, entrepreneurs, real estate investors, professionals, and high net worth individuals, through four divisions: the Commercial Bank, the Retail Bank, the Merchant Bank, and the Correspondent Bank.

18. Defendant **Stephen H. Gordon** is the founder of Opus. He is, and at all relevant times was, the CEO of the Bank, Chairman of the Bank's Board of Directors, Chairman of the Bank's Executive Committee, and a member of the Directors' Loan Committee. Gordon was central to the operations of Opus both before and during the Class Period. Opus' annual reports on Form 10-K filed with the FDIC during the Class Period state that "retaining … Stephen H. Gordon … is important to our success as he drives our strategic direction, entrepreneurial culture and possesses valuable knowledge

about the banking and investment banking industries and our business that would be difficult to replicate or replace."

19. Gordon acquired significant banking and lending experience prior to founding Opus. Gordon served as Chairman of the Board of Fremont General Corporation ("Fremont") and Fremont Reorganizing Corporation, formerly Fremont Investment and Loan ("FRC"), from November 2007 to June 2010, and as Chief Executive Officer of FRC from December 2007 to September 2008. Prior to Fremont, Gordon was the Founding Chairman and Chief Executive Officer of Commercial Capital Bancorp, Inc. ("CCBI") and its subsidiaries (which included a federal chartered savings bank, a commercial banking company, and a registered broker dealer). CCBI was acquired by Washington Mutual, Inc. in October 2006. Prior to CCBI, from 1995 through 1996, Gordon was the sole stockholder, director, and President of Gen Fin. Inc., the general partner of Genesis Financial Partners, L.P., a hedge fund that invested exclusively in underperforming middle market financial institutions. From October 1988 to July 1995, Gordon was an investment banker at Sandler O'Neill + Partners, LP. During the Class Period, Gordon's total annual compensation was $3,299,664 and $1,550,696 in 2015 and 2016, respectively. Gordon spoke on all of the Bank's quarterly earnings calls during the Class Period, signed Opus' Forms 10-K for the fiscal years ended 2014, 2015, and 2016, and the Bank's Forms 10-Q for each quarter during the Class Period. Gordon also signed a Sarbanes-Oxley ("SOX") certification in connection with each Form 10-K and 10-Q filed during the Class Period that represented that (1) the Bank's financial statements were free of misstatements and omissions; (2) the Bank's financial statements were prepared in accordance with GAAP; and (3) the Bank's internal controls and procedures over financial disclosures and reporting were effective.

20. Defendant **Michael L. Allison** joined Opus in August 2011 as the Bank's Executive Vice President and Chief Credit Officer ("CCO"). In March 2013, Allison

was promoted to Co-President of the Bank and in July 2013, Allison was named President of the Commercial Bank. Allison served as both Co-President of the Bank and President of the Commercial Bank until his departure in January 2017. As Co-President of the Bank and President of the Commercial Bank, Allison was responsible for the Bank's commercial business and real estate related credit, relationship-based corporate and commercial banking, loan asset generation, and bank strategy. On April 28, 2016, Allison was elected to the Bank's Board of Directors. Following his election to the Board, Allison was appointed to the Bank's Executive Committee and the Directors' Loan Committee. Prior to and during his employment at Opus, Allison's banking career focused on credit and origination related to commercial banking. Allison served as the Executive Vice President and Chief Credit Officer at Cascade Bancorp from September 2009 until August 2011, where he drove policy, organization, and process enhancements to allow for the proper recognition of problem assets and the evaluation of credit losses. From 2001 to 2009, Allison held executive positions at Washington Mutual, where he initially joined as Executive Vice President, Senior Credit Officer of Washington Mutual Commercial. He also served as Executive Vice President, Head of Commercial Real Estate Lending Group (now part of J.P. Morgan Chase & Co.), and ultimately served as Washington Mutual's Executive Vice President, Deputy Chief Credit Officer, focusing on, among other things, credit related to commercial banking. From 1986 to 2001, Allison held senior credit and origination positions with Seafirst Bank and Bank of America in Washington and Oregon. From 1984 to 1986, Allison worked at Barclays Bank and Barclays American Business Credit. In 2015, Allison's total annual compensation at Opus was $1,112,921. On January 6, 2017, Allison resigned from his positions at Opus, but entered into a Consulting Agreement with the Bank. The Consulting Agreement is for a term of 18 months, subject to renewal or earlier termination by the parties. Under the Consulting Agreement, Allison will provide consulting services to the Bank related to certain corporate, credit, and regulatory

matters and will receive $30,000 a month in compensation. During the Class Period, Allison spoke on all of the Bank's quarterly earnings calls up until his departure from Opus in January 2017.

21. Because of the Individual Defendants' positions with the Bank, they had access to adverse undisclosed information about the Bank's business, operations, operational trends, financial statements, markets and present and future business prospects via access to internal corporate documents (including the Bank's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management, sales and Board of Directors meetings and committees thereof, and via reports and other information provided to them in connection therewith.

22. It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in the Bank's public filings, press releases and other publications and earnings calls, as alleged herein, are the collective actions of the narrowly defined group of defendants defined above as the Individual Defendants. Each of the Individual Defendants as officers of Opus, by virtue of their high-level positions with the Bank, directly participated in the management of the Bank, were directly involved in the day-to-day operations of the Bank at the highest levels, and were privy to confidential proprietary information concerning the Bank and its business, operations, growth, financial statements and financial condition, as alleged herein. Each acted on behalf of the Bank and the actions of each, as alleged herein, can be imputed to the Bank. The Individual Defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, knew or recklessly disregarded that the false and misleading statements described herein were being issued regarding the Bank, and approved or ratified these statements, in violation of the federal securities laws.

23. As officers and controlling persons of a publicly held company whose common stock was and is registered with the SEC pursuant to the Exchange Act, and was and is traded on the NASDAQ, and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Bank's financial condition and performance, growth, operations, financial statements, business, markets, management, earnings and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Bank's publicly-traded common stock would be based on truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

24. The Individual Defendants, because of their positions of control and authority as officers and/or directors of the bank, were able to and did control the content of the various FDIC filings, press releases and other public statements pertaining to the Bank during the Class Period. The Individual Defendants were each provided with copies of the documents alleged herein to be misleading, including the Company's quarterly and annual filings and the prepared remarks for each of the Company's quarterly earnings conference calls, prior to or shortly after their issuance and had the ability or opportunity to prevent their issuance or cause them to be corrected. Accordingly, the Individual Defendants are responsible for the accuracy of the public reports and releases detailed herein and are therefore primarily liable for the representations contained therein.

## IV. <u>SUBSTANTIVE ALLEGATIONS</u>

### A. <u>Background</u>

25. The activities arising from Opus' Commercial Bank are the focus of this action. The Commercial Bank is comprised of several smaller banking "units." During the Class Period the units included Commercial Banking, Business Banking, Healthcare

Banking, Technology Banking, Fiduciary Banking, Institutional Syndications and Commercial Real Estate Banking, which includes Income Property Banking, the Structured Finance Group, and the Capital Markets Group. At times, Defendants referred to the Commercial Bank as the "commercial and specialty banking divisions." Three units within the Commercial Bank fueled Opus' growth during the Class Period: Technology Banking, Healthcare Banking, and Corporate Finance.

26. The Technology Banking unit was developed in June 2012, and provided a "range of banking products, services and solutions to later-stage technology companies, including to clients in the software, hardware, information technology services, and semiconductor sections." On July 25, 2016, Opus announced it was deemphasizing its Technology Banking unit.

27. The Healthcare Banking unit was founded in June 2013, and provides financing and banking solutions "tailored to the needs of companies in the healthcare industry, including loans and lines for working capital, expansion acquisition, consolidation and transition." The Healthcare Banking unit was divided into two groups, a "Professional Practices" group which included lending to physicians, dentists, veterinarians, and ophthalmologists in group or private practices, and a "Healthcare Provider" group, which focused on lending to pharmacies, outpatient or imaging centers, assisted living, skilled or memory care nursing facilities, community hospitals, and management service organizations. On January 30, 2017, Opus announced that it was deemphasizing its Healthcare Professional Practices group and would not fund loans in that group for the foreseeable future.

28. The Corporate Finance unit was formed in February 2014 "to specifically focus on providing senior debt to lower middle market companies for mergers, acquisitions, balance sheet restructurings, recapitalizations, leveraged buy-outs and growth capital."

**B. Defendants Falsely Assure Investors of Opus' Conservative Approach to Credit and Stringent and Disciplined Underwriting**

29. Prior to Opus' IPO, multifamily real estate loans dominated the Bank's loan portfolio, which the market viewed as a relatively safe asset class for banks, even through financial downturns. However, over the course of the Class Period, the Commercial Bank experienced rapid growth that resulted in a corresponding shift in the overall loan mix for Opus' loan portfolio. By August 2016, Commercial Bank loans accounted for 27.8% of the Bank's loan portfolio, up from just 3.6% in June 2013, largely driven by Technology Banking, Healthcare Banking, and Corporate Finance units. As of July 2016, 68% of the Bank's originated loan pipeline was from the Commercial Bank. At the end of the Class Period, the average size of a Commercial Bank loan was $1.9 million.

30. As Opus' loan portfolio shifted from relatively low-risk multifamily real estate to riskier commercial loans, Defendants continuously assured investors that Opus was committed to a "conservative" credit culture and employed "disciplined" and "stringent" underwriting standards. In response, the market reacted favorably to Opus' dramatic growth story, assured that the growth was occurring in a prudent and measured fashion. Securities analysts following the Bank, including Credit Suisse, J.P. Morgan, Piper Jaffray, and JMP Securities, regularly lauded Opus for its "superb" credit, "strong credit quality," and "strong" credit trends.

31. Although Defendants crafted a public perception of layered credit controls designed to minimize risk in underwriting and identify and rectify problem loans early through ongoing portfolio monitoring, the true story was much different. Former employees describe Gordon as obsessed with chasing yield, and explain that he ran Opus like an investment bank and exerted extreme pressure on employees to close loans.

32. A significant indication of Gordon's desire to run Opus as a trading floor rather than as a conservatively managed lending institution is the physical layout of the

Bank itself. As described by Confidential Witness 1 ("CW1"), Gordon sat at a white table in the middle of the 14th floor, surrounded by 16 members of senior management. Gordon had an office, but he used it only about 10% of the time, instead choosing to conduct his daily business at the white table.

33. Every Friday, Gordon would hold weekly sales calls, which were attended by approximately 50 employees, approximately half in person and half by phone. Former employees describe these calls as stressful, with Gordon humiliating or belittling employees if they were behind on closing loans.

34. Further, Opus' credit environment was anything but conservative. The Bank routinely extended risky loans to companies that had little to no cash flow and underwrote "enterprise value loans" that had no asset-backed collteral, but were instead underwritten based on a forecasted future value of the entity receiving the loan. Moreover, Defendants knew (or recklessly disregarded) when riskier loans were extended because they required approval through a formalized process, although former employees confirm that this process was often disregarded, with Gordon making it clear that if he wanted a loan closed it would be done.

35. For a time, Defendants' plan to inflate Opus' balance sheet with risky loans while assuring investors those loans were originated in a disciplined and prudent credit environment was successful. The rapid expansion of the Commercial Bank fueled record-setting loan originations for the Bank in the fourth quarter of 2014, the fourth quarter of 2015, and the first and second quarters of 2016. From time to time Defendants would discuss certain problem loans on quarterly earnings calls, but continually (and falsely) assured investors that there was no negative trend in the overall creditworthiness of the Bank's loan portfolio.

**C. Defendants Failed to Disclose that Opus' Lacked The Ability to Monitor its Loan Portfolio and to Establish Appropriate Reserves for Loan Losses**

36. Opus' policies and GAAP required Opus to establish a reserve for potential credit losses in its loan portfolio. This reserve is known as an allowance for loan losses or "ALL."

37. According to Opus' public filings, the amount of the Bank's ALL "is based on management's assessment of the nature of the loan portfolio, previous loss experience or peer data, known and inherent risks in the portfolio, the estimated value of any underlying collateral, adverse situations that may affect a borrower's ability to repay and current economic, environmental conditions and the results of our ongoing reviews of our portfolios." Opus' "allowance includes a reserve for the originated and acquired nonimpaired loan portfolio as determined under our allowance methodology and the reserve for the acquired impaired loans as calculated in our quarterly re-estimation process under ASC 310-30."[4]

38. Opus' quarterly and annual reports filed during the Class Period repeatedly represented to investors that the Bank had robust and rigorous internal controls for underwriting loans and monitoring them after their origination and investors were assured that Defendants had the necessary information to establish sufficient ALL. For example, the Bank's quarterly and annual reports represented that the Bank had a "credit policy" and procedures in place "to maintain high quality credit standards" and "disciplined underwriting." The filings further represented that (1) Defendants received "monthly loan monitoring reports" that contained "a variety of loan portfolio metrics and highlight[ed] existing or potential issues" within the portfolio; (2) the Bank conducted semi-annual stress tests on the entire loan portfolio; (3) the Bank conducted regular

---

[4] "ASC" refers to the Financial Accounting Standards Board Accounting Standard Codification which codifies GAAP.

reviews of its loan portfolio to monitor "compliance with loan covenants and determine appropriate loan risk rating"; and (4) the Bank "actively monitors loans that management believes indicate additional potential credit risk."

39. Further, additional data demonstrating risky underwriting and ongoing portfolio deterioration that would have required an increase in ALL was either provided directly to, or was easily accessible by, Defendants. For example, as described by CW3, all loan and borrower information, including the risk rating of all loans in the Bank's portfolio, was stored in CreditQuest, an internal software program used by the Bank.

40. Additionally, according to CW1 PLRs were compiled on a regular basis and provided to Allison. CW2 explained that PLRs were also discussed at Bank-wide quarterly credit review meetings attended by the Chief Credit Officer, members of the Special Credits team, all unit Credit Administrators, and portfolio analysts. Gordon also knew of troubled loans as illustrated by CW2, who explained that on one occasion in 2015, Gordon called CW2, a portfolio analyst in the Healthcare Banking unit, into his office to discuss a problem loan to a dental practice.

41. Despite Defendants' knowledge of the impaired loans and a deteriorating portfolio, they failed to adequately reserve for ALL during the Class Period. Indeed, in its 2016 annual report filed on Form 10-K, Opus disclosed that it had material weaknesses in internal controls over financial reporting related to inadequate review of the allowance for loan losses and inadequate scope of the internal credit function during 2016. The root cause of the material weaknesses related to Opus' failure to have sufficiently qualified personnel reviewing impaired loans. Opus further belatedly admitted after the Class Period it had inadequate knowledge of relevant regulations governing the identification of charge-offs on impaired loans, ineffective review over the evaluation of specific reserves and/or charge-offs on impaired loans, inadequate support for assumptions used in the determination of the allowance for loan losses on impaired loans, and that the Bank's internal credit function did not have a process in

place to make timely changes to its review scope and procedures as credit quality began to deteriorate.

42. Further, although Opus disclosed boilerplate "risk factors" regarding the potential that the Bank's ALL may not cover credit losses and that the Bank may incur credit losses despite its credit standards, those risk factors were materially incomplete and insufficient to warn investors about Opus' potential credit losses because, *inter alia*, the risk factors failed to disclose that Opus was currently disregarding its own credit controls, engaging in risky lending practices, and failing to increase its ALL to account for those practices. The risk factors also failed to disclose that Defendants knew that credit losses were likely given their access to monthly loan monitoring reports, risk rating reports, semi-annual portfolio stress tests, and problem loan reports, but that Defendants failed to increase the Bank's ALL as a result of that information.

**D. Confidential Witness Allegations**

43. **Confidential Witness 1 ("CW1")** was President of Commercial Real Estate Banking from November 2010 until June 2015 and a member of the Executive Committee of the Bank from January 2015 until CW1s departure in June 2015. CW1 reported to Gordon and worked on the 14th floor, also known as the executive or sales floor, at the Bank's headquarters in Irvine, California.

44. CW1 said Gordon sat at a long white table in the middle of the 14th floor. Approximately sixteen members of senior leadership sat with Gordon at this table during CW1's tenure, including CW1; CW4; Ed Padilla, Executive Vice President, Co-Chief Lending Officer, Head of Commercial Real Estate Banking; Sally Hazen, President of Correspondent Banking; Jennifer "Jenny" Simmons, Executive Vice President, Chief Operating Officer; Phil Petrozzi, Senior Vice President, Senior Managing Director, Head of Depository Service; Miguel Serricchio, Senior Managing Director - Head of Alternative Strategies; Jeff L. Leonard, Senior Vice President, Director of Corporate Strategy / Communications; and Christine Borrelli, Managing Director.

45. The white table was about eight to ten feet away from other employees, who sat at desks nearby. CW1 said that Gordon insisted that there be only a few offices on the executive floor and the majority of employees sat at desks out in the open. Gordon did have an office, which CW1 estimated he used about 10% of the time.

46. CW1 said that Gordon was focused on yield, and aggressive in his exploration of how to "get a better yield at all times." CW1 said Gordon set up Opus like a "New York trading floor" and had little understanding of how a commercial, "traditional" bank worked.

47. CW1 said that Gordon relied heavily upon Allison to organize and oversee the Bank's credit and lending structure. CW1 explained that Allison continued to oversee the credit and lending process at the Bank even after Allison's promotion from Chief Credit Officer to Co-President of the Bank and President of Commercial Banking. Allison received frequent reports that documented troubled loans. While sitting at the white table with Gordon, CW1 observed Gordon and Allison communicating in person on a daily basis.

48. CW1 said Opus had both "policies" and "guidelines" in place with regard to credit and underwriting. Bankers were permitted to deviate from guidelines, but not policies. Loans that deviated from guidelines required approval by the Chief Credit Officer and Allison through a formalized process. First, a credit memo would be prepared discussing the reasoning and rationale for the deviation from the guideline. The memo would be provided to the Credit Administrator who oversaw the banking unit originating the loan. If the Credit Administrator supported the loan, it would be referred to the Chief Credit Officer and Allison. Discussions among the banker proposing the loan, the Chief Credit Officer, and Allison regarding whether the loan was appropriate would take place in closed-door conference rooms and the Chief Credit Officer and Allison would determine whether to approve the loan.

49. Larger loans, totaling $20 million or more, required the approval of the Directors' Loan Committee, regardless of whether the loan deviated from Opus' guidelines. The Directors' Loan Committee included Gordon, Allison, and two independent board members, Michael Meyer and Robert Shackleton. CW1 said that members of this committee had professional expertise in many areas, including real estate; however, no one on the Committee had a background in healthcare banking or technology banking.

50. CW1 explained that following closing, loans were monitored. Portfolio analysts from the various banking units would check on the status of the loan's collateral and review other relevant borrower information. If a loan began to experience problems, an annotation would be made in the loan file. Problem loans would eventually be compiled in PLRs that were delivered to Allison on at least a quarterly basis.

51. **Confidential Witness 2 ("CW2")** was a portfolio analyst in the Healthcare Banking unit from July 2013 until August 2016. CW2 worked in the Healthcare Professional Practice group. CW2's position entailed underwriting and portfolio management. CW2 was based at the Bank's headquarters in Irvine, California.

52. CW2 explained that Gordon operated Opus as an "investment bank" in addition to its role as a community bank.

53. CW2 described the structure of the Healthcare Banking unit as a "working group" with the unit's sales-focused employees and credit-focused employees all sitting together in an open "trading floor" style set-up. CW2 and other portfolio analysts reported directly to the Healthcare Credit Administrator, who oversaw the Healthcare Banking unit; but CW2 also had a "dotted line" reporting relationship with the Senior Managing Director of the Healthcare Banking unit, who was responsible for all healthcare lending. The Healthcare Banking unit also included Relationship Managers, who were responsible for generating loan business and reported directly to the Senior

Managing Director. In total, there were approximately 13 employees in the Healthcare Banking unit, including remote managing directors and portfolio managers.

54. CW2 explained that the Healthcare Credit Administrator oversaw the Healthcare Banking unit and reported directly to the Bank's Chief Credit Officer. The Healthcare Credit Administrator was a designee of the Chief Credit Officer and had authority to sign off on loans up to approximately $10 million. Larger deals required authorization from senior management. The Healthcare Credit Administrator was responsible for monitoring the credit quality of the healthcare loan portfolio on a daily basis. When a loan demonstrated problems, the Healthcare Credit Administrator would ensure that the Relationship Manager for the loan was in contact with the borrower. Additionally, the Healthcare Credit Administrator performed periodic credit reporting on the quality of the healthcare loan portfolio, noting any covenant violations and potential repayment problems. CW2 reported that portfolio managers prepared problem loan reports which were reviewed by the credit department and presented at quarterly Bank-wide credit review meetings.

55. Throughout CW2s tenure at the Bank, CW2 attended the quarterly credit review meetings during which the PLRs were addressed. The Chief Credit Officer, members of the Special Credits team, all unit Credit Administrators, and other portfolio analysts attended the quarterly meetings. The meetings were overseen by the Special Credits Senior Vice President or the Senior Loan Review Chief Officer. The objective of the quarterly credit review meetings was to assess the risk, asset quality ratings, and progress on action plans for all problem loans in the portfolio. To that end, the meetings focused on identifying loan weaknesses, flagging any missing borrower information, and updating outdated borrower and loan information. CW2 explained that discussion at these meetings was robust, and there was no "sugar coating" problem loans.

56. CW2 stated that the credit deterioration of certain loans in the Healthcare Practice portfolio was "not sudden" and did not "happen all at once." CW2 explained

that certain events often signaled a potentially problematic loan such as a borrower submitting financial statements late or experiencing a slip in profits or cash flows. If a loan experienced similar problems two quarters in a row, it would be identified as having a covenant violation. If the loan experienced problems for a third consecutive quarter, it would be downgraded.

57. CW2 explained that CW2 received regular "ticklers" from the Credit Administrative and Testing ("CAST") department in connection with CW2's portfolio management duties. The "tickler" served as reminder of the items needed from the borrower for each loan. For example, a "tickler" would remind CW2 when CW2needed to request financial statements or annual insurance renewals from a borrower. CW2 explained that in some instances, borrowers failed to provide this information.

58. For example, CW2 said that in late 2015, a loan to a dental practice began experiencing repayment issues. The accounting statements from the practice were "sloppy" and the borrower refused to provide financial statements in the first quarter after the loan closed. CW2 recommended putting the dental practice on a cash control program, which would entitle the Bank to the practice's collections to service the loan, with any leftover money flowing to the borrower to keep the practice afloat, but the Relationship Manager refused to implement such a program. This loan eventually defaulted.

59. Additionally, in 2015, CW2 had a one-on-one meeting with Gordon regarding a problem loan to a dental practice. The borrower did not produce financial statements even though they were required as part of the loan covenant, and Gordon wanted to know how CW2 could fix this problem. CW2 said that this experience demonstrated to CW2 that Gordon paid attention to troubled loans.

60. CW2 also explained that when performing underwriting duties, CW2 was rarely encouraged to conduct site visits or given direct access to clients to ask questions or request additional supporting documentation. At previous jobs, CW2 had direct

access to clients. CW2 said that at Opus the Relationship Manager remained a liaison with the client during the underwriting process. If more documentation was needed, CW2contacted the Relationship Manager and it was up to the Relationship Manger to get it, or decline the request made by CW2. CW2 described this as having to "operate in the dark."

61. CW2 explained that in 2015, CW2 worked on a loan relationship that included several term loans for the acquisition of four similar medical practices and one term loan for a managing group to oversee the four medical practices. The total value of the deal was approximately $3 million. CW2 had concerns about the loan based on the financial information received from the borrowers. For example, it looked as if one of the four practices may have paid the expenses of one of the other practices, but the expenses were never run through any of the income statements. CW2 raised the issue with the loan's Relationship Manager in 2015 but nothing was done. Instead, CW2 was told that the new management for the practices would clean up the issues. The loan began to show warning signs of default, and was referred to Special Credits.

62. In 2015, CW2 also attended in person one of Gordon's weekly Friday morning sales meeting in place of CW2's supervisor. At this meeting, Gordon reviewed the Bank's loan pipeline and directed questions regarding the progress of pending loans to the heads of sales from each banking unit. CW2 estimated that approximately 50 employees participated in the meeting, about half in person and the other half dialed-in on speaker phone. CW2 said that in this meeting, Gordon expressed concern to the group about the quality of the portfolio and put together a team to run analytics on the portfolio.

63. CW2 also attended a Board of Directors meeting in or around the fourth quarter of 2014 during which enterprise value loans were discussed at length. At that time, enterprise value lending was a new venture for the Bank.

64. **Confidential Witness 3 ("CW3")** was a Team Lead in the CAST department. CW3 was responsible for analyzing and reviewing loan covenants for pending and existing loans. CW3 worked for Opus from November 2015 until June 2016 at the Company's headquarters in Irvine, California.

65. CW3 explained that the CAST department had only 8-10 other employees, half of whom were senior-level and half of whom were entry-level. CW3 was senior-level. The CAST department conducted loan risk assessments by testing the covenants of all pending and existing loans. At the conclusion of the risk assessment, CW3's department would send its results to the banking unit where the loan was generated. On average, CW3 reviewed about four to five loans each day.

66. CW3 explained that CW3 used a software system called CreditQuest while at Opus, which contained all of the loan and borrower information for every loan in the Bank's portfolio. CW3 would access CreditQuest to obtain the information necessary for testing covenants, including the borrower's financial statements and tax forms. Following CW3's review of the loan, CW3 would update CreditQuest with the risk rating calculation. CW3 explained that CreditQuest was accessible to, and regularly monitored by, all employees of the Bank. CW3 stated that Gordon knew about CreditQuest. CW3 explained that CW3's department would conduct a risk assessment of existing loans on a monthly, quarterly, and yearly basis. CW3 explained that the banking unit that generated the loan would also conduct its own risk assessment of the loan, and then the CAST department would "double check" the banking unit's calculations.

67. During CW3's tenure at Opus, CW3 stated that CW3's risk calculations often did not match those of the Technology Banking unit. CW3's calculations would indicate that the loan was riskier than the Technology Banking unit's calculations, even though the Technology Banking unit and the CAST department were using the same formula in the loan document to calculate the risk. CW3 explained that the calculations

differed because the Technology Banking unit would depart from the covenants in the loan document in order to achieve a lower risk rating for the loan. For example, several technology loans posted accounts receivable ("AR") as collateral. The loan document would define the level of AR required for eligibility (*i.e.*, for the Bank to consider the AR to be accessible collateral). CW3 would use that definition to calculate the risk of the loan and determine whether the AR was eligible. On several occasions, CW3 would conclude the AR was ineligible based on the AR definition in the loan document, but the Technology Banking unit would disregard the AR definition in the loan document in order to deem the AR eligible, and therefore arrive at a lower risk rating for the same loan. As an example, CW3 explained that the loan document would state that AR not collected after 90 days was ineligible, but the Technology Banking unit would not discount the loan if the AR was past due by 90 days and would still deem the AR eligible. CW3 explained that loans generated by the Healthcare Banking unit also regularly used AR as collateral.

68. CW3 informed the Technology Banking unit when CW3's risk calculations differed from its risk calculations, but it was ultimately up to the Relationship Manager for the loan to make a decision as to whether to change the risk rating of the loan.

69. CW3 explained that unlike prior jobs at other companies, CW3 was not assigned to specific loans or even to a specific banking unit, which made it impossible for one analyst to see a loan through to full repayment. CW3 explained that a particular analyst may review a loan once and then "never again" review that same loan. Analysts who had reviewed a loan previously would leave notes and other observations in the loan files, however. CW3 would sometimes communicate with analysts who had reviewed the loan before CW3, particularly if CW3 did not understand how the analysts reached their risk conclusions. On more than one occasion, an analyst who reviewed a loan prior to CW3 would explain that the head of the banking unit that originated the loan had directed the analyst to calculate the risk using a definition or covenant that differed from

the one in the loan document. CW3 stated that the banking unit heads often had "complete disregard" for covenants in the loan document.

70. **Confidential Witness 4 ("CW4")** was a senior banker in the Technology Banking unit from July 2012 until July 2016. CW4 reported to Gordon and sat next to him at the white table located on the 14th floor, as described by CW1.

71. CW4 described Opus as having "no credit culture" instead it was the "Stephen Gordon culture." Gordon fostered a "grow or die" culture and directed employees to "grow at any expense." CW4 stated, "[W]e were told to chase yield. That's what you were being paid for, to close deals." CW4 explained that Gordon would "rake [employees] over the coals" during the Friday sales calls, described above by CW2, for delays in closing loans. For example, when one deal was lost to a competitor, Gordon challenged CW4 over not matching the weaker covenants offered by that competitor. CW4 described Gordon as an "unparalleled micromanager" and stated that the pressure on underwriters to close loans was "so intense" that it would "have affected their ability to mitigate risk to the Bank."

72. CW4 also stated that Opus' problem loans were often disregarded. As an example, CW4 described a technology loan that went bad in 2016 and ultimately led to a payment default in early 2017. CW4 was made aware of this loan directly by an individual in the Credit Products Group. According to CW4, the loan included a covenant that would ensure adequate liquidity for the loan or the ability of the Bank to take action prior to the borrower running out of cash. However, the credit agreement was amended such that the Bank no longer had the same control over the loan recipient's liquidity. While such an amendment followed the formalized credit authorization process, Gordon made the ultimate decision on the amendment. CW4 explained that "Gordon was front and center on this deal for about a year." Following the amendment to the credit agreement, the loan recipient filed for bankruptcy. CW4 stated that "if, at the time of filing, you could see the assets and liabilities [of the loan recipient] and the

delta between the two, you would be shocked." At the time the company filed for bankruptcy, there was no money left to repay the loan. Had the credit agreement not been amended, the Bank could have declared a default on the loan and collected a significant amount of cash to offset the loan balance. Based upon discussions with an individual in Opus' Credit Products Group, CW4 suspected the credit agreement was amended to avoid further reserves against and write-offs related to the loan.

73. CW4 explained that Opus did have a formalized credit authorization process in place, but that from CW4's perspective that process was not being followed from late 2015 into 2016. The formalized process required sign off on a "Credit Authorization Form," which was electronically available. If the loan was greater than $20 million, approval by the Directors' Loan Committee was also required. However, from late 2015 to 2016, Gordon effectively overrode the formalized process by making it clear that loans he wanted to close would be closed. Gordon often made the final determination on terms and pricing of a loan and interacted directly with commercial bankers in doing so.

74. Further, CW4 said that although the Directors' Loan Committee would review and approve certain loans, they did not have experience with the types of loans they reviewed. For example, CW4 explained that if a large loan from Healthcare Banking came before the Committee, the Committee could look at the underwriting, but nobody actually had experience sufficient for them to understand the collateral, or lack thereof, securing the loan. This often included enterprise value loans.

75. As an example of a deviation from the Bank's formalized credit authorization process, CW4 provided an example from August of 2016, just prior to the state and federal banking examiners coming to the Bank. The Bank's internal credit administration recommended downgrading a loan. The portfolio manager processed the credit authorization and the appropriate credit administrators approved the downgrade, but Gordon, specifically, overrode the downgrade of the loan so as to not have a negative impact on earnings. CW4 was informed of this deviation directly by an individual in the Credit Products Group.

76. With regard to enterprise value loans, CW4 explained that these were something Opus started doing a few years prior, and were a troubled practice but fit with Gordon's whole business plan of maintaining high volumes of loans. CW4 stressed that Gordon's focus on a large volume of loans was all about "yield and asset growth." There was very little consideration of the riskiness of loans.

**E. <u>False and Misleading Statements and Omissions</u>**

77. On January 26, 2015, the Bank conducted a quarterly earnings call to discuss its fourth quarter and full year 2014 financial results. Defendants emphasized the Bank's growth in its Commercial Bank, as well as Opus' allegedly strong credit discipline, during the call. For example, Gordon stated:

> ***We have continued to grow client relationships while maintaining discipline and credit culture.***[5] And we're pleased that our commercial business and specialty banking divisions[6] all contributed to the strong origination levels this quarter, including from healthcare, technology, corporate finance, commercial business, structured finance and institutional syndications, representing 36% of our new loan fundings during the quarter, and 57% of our pipeline as of January 1, 2015.
>
> ****
>
> Our strong growth, record new loan fundings, high-quality deposits, ***continued discipline and unwavering approach to credit,*** strong capital ratios, and scalable business have us confident in our prospects as we enter 2015.

78. Allison reiterated the Company's commitment to credit, explaining:

> ***Along with our growing originations we continued to maintain our focus on credit culture***. . . . ***We continue to maintain our stringent, disciplined underwriting standards on our entire portfolio***, a discipline that anticipates potential client issues, and allows us the opportunity to address those issues."

79. The bolded and italicized text in paragraphs 77 and 78 regarding Opus' disciplined credit culture and underwriting standards was false and misleading and omitted material facts because (1) Opus' credit culture was aggressive and not conservative; (2) Opus' credit controls, including the Bank's purported credit monitoring, were either disregarded or ineffective at identifying problem loans; (3) Opus was underwriting risky loans to entities with little to no cash flow or collateral; and (4) Opus had ramped up enterprise value lending during the fourth quarter of 2014.

---

[5] Bolded and italicized language is added emphasis, unless otherwise noted.

[6] As noted earlier in paragraph 25, from time to time Defendants use the term "commercial business and specialty banking divisions" when referring to loans in the Commercial Bank.

Defendants knew or recklessly disregarded that these statements were false and misleading because:

a. the Bank's public filings during the Class Period admit that Defendants reviewed "monthly loan monitoring reports" that included a "variety of loan portfolio metrics and highlight[ed] existing or potential issues" within the portfolio;

b. throughout the Class Period, the Bank had quarterly bank-wide credit review meetings during which PLRs were discussed, as described by CW2 in paragraphs 54 and 55;

c. Defendants had access to CreditQuest and could easily generate a risk rating report for all loans in the Bank's portfolio as described by CW3 in paragraph 66;

d. the Bank's public filings during the Class Period admit that the Bank conducted semi-annual stress tests of the entire loan portfolio;

e. the Bank's public filings during the Class Period admit that the Bank conducted regular reviews of its loan portfolio to monitor compliance with loan covenants and to determine appropriate loan risk rating;

f. the Bank's public filings during the Class Period admit that the Bank actively monitors loans that management believes indicate additional potential credit risk;

g. as explained by CW4, Gordon often made the final determination on terms and pricing of a loan and interacted directly with bankers in the Commercial Bank in doing so;

h. as explained in paragraph 63, enterprise value loans were discussed during a Board meeting in 2014 attended by CW2 and Gordon was a member of the Board at that time;

i. Allison had access to numerous reports demonstrating the true credit quality of Opus' portfolio, including PLRs as explained by CW1 in paragraphs 47 and 50;

j. Allison was required to approve any loan that deviated from Bank guidelines as explained by CW1 in paragraph 48 and therefore was aware of or recklessly disregarded the true nature of credit risks in Opus' loan portfolio; and

k. Gordon knew that he pressured employees to close loans at any cost, regardless of risk, as explained in paragraph 71.

80. The market responded favorably to Defendants' false and misleading statements regarding the health of the Bank's originated loan portfolio and the Bank's

disciplined credit culture. For example, a January 26, 2015 Sandler O'Neill + Partners analyst report noted that ***"credit quality remained superb."*** Likewise, a January 27, 2015 J.P. Morgan analyst report explained that ***"credit trends were positive."***

81. On February 27, 2015, Opus filed with the FDIC its annual report on Form 10-K for full fiscal year 2014 ("2014 10-K"), signed by Gordon. The 2014 10-K touted the Bank's "***conservative risk profile***" as one of its "competitive strengths" explaining that "***we maintain a conservative credit culture with strict underwriting standards.***"

82. The bolded and italicized text in paragraph 81, regarding Opus' conservative credit culture and strict underwriting standards, was false and misleading and omitted material facts because (1) Opus' credit culture was aggressive and not conservative; (2) Opus' credit controls, including the Bank's purported credit monitoring, were either disregarded or ineffective at identifying problem loans; (3) Opus was underwriting risky loans to entities with little to no cash flow or collateral; and (4) Opus had ramped up enterprise value lending during the fourth quarter of 2014. Defendants knew or recklessly disregarded that these statements were false and misleading because:

a. the Bank's public filings during the Class Period admit that Defendants reviewed "monthly loan monitoring reports" that included a "variety of loan portfolio metrics and highlight[ed] existing or potential issues" within the portfolio;

b. throughout the Class Period, the Bank had quarterly bank-wide credit review meetings during which PLRs were discussed, as described by CW2 in paragraphs 54 and 55;

c. Defendants had access to CreditQuest and could easily generate a risk rating report for all loans in the Bank's portfolio as described by CW3 in paragraph 66;

d. the Bank's public filings during the Class Period admit that the Bank conducted semi-annual stress tests of the entire loan portfolio;

e. the Bank's public filings during the Class Period admit that the Bank conducted regular reviews of its loan portfolio to monitor compliance with loan covenants and to determine appropriate loan risk rating;

f. the Bank's public filings during the Class Period admit that the Bank actively monitors loans that management believes indicate additional potential credit risk;

g. as explained by CW4 in paragraph 73, Gordon often made the final determination on terms and pricing of a loan and interacted directly with bankers in the Commercial Bank in doing so;

h. as explained in paragraph 63, enterprise value loans were discussed during a Board meeting in 2014 attended by CW2 and Gordon was a member of the Board at that time;

i. Allison had access to numerous reports demonstrating the true credit quality of Opus' portfolio, including PLRs as explained by CW1 in paragraphs 47 and 50;

j. Allison was required to approve any loan that deviated from Bank guidelines as explained by CW1 in paragraph 48 and therefore was aware of or recklessly disregarded the true nature of credit risks in Opus' loan portfolio; and

k. Gordon knew that he pressured employees to close loans at any cost, regardless of risk, as explained in paragraph 71.

83. On April 27, 2015, the Bank conducted a quarterly earnings call to discuss its first quarter 2015 financial results. Defendants again emphasized the Bank's growth in its Commercial Bank with Gordon noting, "The first quarter saw a marked increase in the contribution of new loan fundings from our Commercial business and Specialty Banking Divisions."

84. Allison spoke to the Bank's credit culture, explaining:

> Along with our ambition to grow originations, ***we continue to emphasize a focused and disciplined credit culture***. . . . ***We continue to maintain stringent underwriting standards across our lending platforms; and our ongoing credit oversight is a partnership with our clients to be aware of and act on their ongoing results.***

85. Further, in response to a question regarding the Bank's $1.9 million provision for specific reserves and risk rating migration during the first quarter of 2015, Allison again assured investors that overall portfolio trends were positive:

> **A:** (Allison) And maybe just to give you a little more color, while we're talking about allowance and provisioning, our total criticized loans for the quarter were actually lower than they were at year-end. ***So the portfolio trends continue to remain positive***. . . . .

86. Further, when asked whether there was anything "showing up that suggests potential downstream credit costs," Allison responded, ***"No. Again, we're hopefully diligently looking at the relationships, and we're not seeing it yet."***

87. The bolded and italicized text in paragraphs 84 – 86 regarding Opus' disciplined credit culture, stringent underwriting, and assurances that the addition of $1.9 million in specific reserves was not indicative of a larger credit trend within the loan portfolio were false and misleading and omitted material facts because (1) Opus' credit culture was aggressive and not conservative; (2) Opus' credit controls, including the Bank's purported credit monitoring, were either disregarded or ineffective at identifying problem loans; (3) Opus was underwriting risky loans to entities with little to no cash flow or collateral; (4) Opus had ramped up enterprise value lending in the fourth quarter of 2014; and (5) the provision for specific reserves was indicative of a larger trend in Opus' originated loan portfolio. Defendants knew or recklessly disregarded that these statements were false and misleading because:

a. the Bank's public filings during the Class Period admit that Defendants reviewed "monthly loan monitoring reports" that included a "variety of loan portfolio metrics and highlight[ed] existing or potential issues" within the portfolio;

b. throughout the Class Period, the Bank had quarterly bank-wide credit review meetings during which PLRs were discussed, as described by CW2 in paragraphs 54 and 55;

c. Defendants had access to CreditQuest and could easily generate a risk rating report for all loans in the Bank's portfolio as described by CW3 in paragraph 66;

d. the Bank's public filings during the Class Period admit that the Bank conducted semi-annual stress tests of the entire loan portfolio;

e. the Bank's public filings during the Class Period admit that the Bank conducted regular reviews of its loan portfolio to monitor compliance with loan covenants and to determine appropriate loan risk rating;

f. the Bank's public filings during the Class Period admit that the Bank actively monitors loans that management believes indicate additional potential credit risk;

g. as explained by CW4 in paragraph 73, Gordon often made the final determination on terms and pricing of a loan and interacted directly with bankers in the Commercial Bank in doing so;

h. as explained in paragraph 63, enterprise value loans were discussed during a Board meeting in 2014 attended by CW2 and Gordon was a member of the Board at that time;

i. Allison had access to numerous reports demonstrating the true credit quality of Opus' portfolio, including PLRs as explained by CW1 paragraphs 47 and 50 ;

j. Allison was required to approve any loan that deviated from Bank guidelines as explained by CW1 in paragraph 48 and therefore was aware of or recklessly disregarded the true nature of credit risks in Opus' loan portfolio; and

k. Gordon knew that he pressured employees to close loans at any cost, regardless of risk, as explained in paragraph 71.

88. Analysts following the Bank continued to react favorably to Defendants' false and misleading representations that the specific reserves recorded during the quarter were not indicative of a larger portfolio trend. For example, an April 27, 2015 Sandler O'Neill + Partners analyst report explained that ***"credit quality remained solid although charge-offs were higher than expected."***

89. On May 8, 2015, Opus filed with the FDIC its quarterly report on Form 10-Q for the first quarter of 2015 ("1Q 2015 10-Q), signed by Gordon. The 1Q 2015 10-Q represented that due to the growth in commercial business loans, ***"we have also emphasized our funding strategy towards commercial business loans with similar stringent underwriting criteria and monitoring procedures as part of our efforts to further diversify our originated portfolio."***

90. The bolded and italicized text in paragraph 89 regarding Opus' stringent underwriting criteria and monitoring procedures in connection with commercial business

loans was false and misleading and omitted material facts because (1) Opus' credit culture was aggressive and not conservative; (2) Opus' credit controls, including the Bank's purported credit monitoring, were either disregarded or ineffective at identifying problem loans; (3) Opus was underwriting risky loans to entities with little to no cash flow or collateral; and (4) Opus had ramped up enterprise value lending during the fourth quarter of 2014. Defendants knew or recklessly disregarded that these statements were false and misleading because:

a. the Bank's public filings during the Class Period admit that Defendants reviewed "monthly loan monitoring reports" that included a "variety of loan portfolio metrics and highlight[ed] existing or potential issues" within the portfolio;

b. throughout the Class Period, the Bank had quarterly bank-wide credit review meetings during which PLRs were discussed, as described by CW2 in paragraphs 54 and 55;

c. Defendants had access to CreditQuest and could easily generate a risk rating report for all loans in the Bank's portfolio as described by CW3 in paragraph 66;

d. the Bank's public filings during the Class Period admit that the Bank conducted semi-annual stress tests of the entire loan portfolio;

e. the Bank's public filings during the Class Period admit that the Bank conducted regular reviews of its loan portfolio to monitor compliance with loan covenants and to determine appropriate loan risk rating;

f. the Bank's public filings during the Class Period admit that the Bank actively monitors loans that management believes indicate additional potential credit risk;

g. as explained by CW4 in paragraph 73, Gordon often made the final determination on terms and pricing of a loan and interacted directly with bankers in the Commercial Bank in doing so;

h. as explained in paragraph 63, enterprise value loans were discussed during a Board meeting in 2014 attended by CW2, and Gordon was a member of the Board at that time;

i. Allison had access to numerous reports demonstrating the true credit quality of Opus' portfolio, including PLRs as explained multiple CW1 in paragraphs 47 and 50;

j. Allison was required to approve any loan that deviated from Bank guidelines as explained by CW1 in paragraph 48 and therefore was aware of or recklessly disregarded the true nature of credit risks in Opus' loan portfolio; and

k. Gordon knew that he pressured employees to close loans at any cost, regardless of risk, as explained in paragraph 71.

91. On July 27, 2015, the Bank conducted a quarterly earnings call to discuss its second quarter 2015 financial results. Defendants again emphasized the Bank's growth in its Commercial Bank with Gordon noting, "Strong performance from our Commercial and Specialty banking divisions, which represented 47% of our new-loan fundings during the quarter, contributed to 172% annual growth in originated commercial business-loan portfolio and 6 basis points of expansion in the yield on our originated-loan portfolio."

92. Gordon assured investors that the Bank was committed to maintaining quality credit as the Bank continued to grow, explaining, "Our strong growth in fee income, new-loan fundings, high-quality deposits, ***conservative approach to credit***, strong capital ratios and scalable business have us confident about the second half of 2015 and on into 2016."

93. Allison provided similar assurances:

> ***While we continue to maintain our stringent disciplined underwriting standards on our entire portfolio, the management of credit risk in the specialty-banking portfolios that we originate is ongoing*** and we will see some risk-rating migrations as our entire portfolio continues to season.

94. Further, in response to a question regarding the Bank's asset quality and credit trends, Allison again represented that credit trends were positive:

> **Q:** And then asset quality, could you tell us what is your classified or special mention loan levels? Or also give us more color on the risk migration that you had referenced. Your non-accruals are very low. Your charge-offs are non-existent. So

> in order to build up a reserve, you have to specifically identify factors that maybe because of your blank slate reserve coverage. Maybe you can tell us what factors you were able to identify to help you build up the reserve this quarter?
>
> **A:** [I]t's really two components. So as the credit transitions to a more challenged risk rate, we, in our ALLL [*sic*], ascribe a higher loss content expectation. So it's coming from that. And then for loans that are criticized classified that deserve a special reserve, we do that analytic as well.
>
> ****
>
> Q: And then so I guess I'm also double checking that there's no kind of credit trend or anything that you're seeing in the marketplace, beyond just your methodology that you're applying to your portfolio of natural accretion?
>
> **A:** ***No, we are not really seeing that***.

95. The bolded and italicized text in paragraphs 92-94 regarding Opus' management of credit risk, stringent and disciplined underwriting, and assurances that there were no negative credit trends in Opus' loan portfolio were false and misleading and omitted material facts because (1) Opus' credit culture was aggressive and not conservative; (2) Opus' credit controls, including the Bank's purported credit monitoring, were either disregarded or ineffective at identifying problem loans; (3) Opus was underwriting risky loans to entities with little to no cash flow or collateral; (4) Opus ramped up enterprise value lending in the fourth quarter of 2014; and (5) there *were* negative credit trends in Opus' loan portfolio. Defendants knew these statements were false and misleading because:

a. the Bank's public filings during the Class Period admit that Defendants reviewed "monthly loan monitoring reports" that included a "variety of loan portfolio metrics and highlight[ed] existing or potential issues" within the portfolio;

b. throughout the Class Period, the Bank had quarterly bank-wide credit review meetings during which PLRs were discussed, as described by CW2 in paragraphs 54 and 55;

c. Defendants had access to CreditQuest and could easily generate a risk rating report for all loans in the Bank's portfolio as described by CW3 in paragraph 66;

d. the Bank's public filings during the Class Period admit that the Bank conducted semi-annual stress tests of the entire loan portfolio;

e. the Bank's public filings during the Class Period admit that the Bank conducted regular reviews of its loan portfolio to monitor compliance with loan covenants and to determine appropriate loan risk rating;

f. the Bank's public filings during the Class Period admit that the Bank actively monitors loans that management believes indicate additional potential credit risk;

g. as explained by CW4 in paragraph 73, Gordon often made the final determination on terms and pricing of a loan and interacted directly with bankers in the Commercial Bank in doing so;

h. as explained in paragraph 63, enterprise value loans were discussed during a Board meeting in 2014 attended by CW2 and Gordon was a member of the Board at that time;

i. Allison had access to numerous reports demonstrating the true credit quality of Opus' portfolio, including PLRs as explained by CW1 in paragraphs 47 and 50;

j. Allison was required to approve any loan that deviated from Bank guidelines as explained by CW1 in paragraph 48 and therefore was aware of or recklessly disregarded the true nature of credit risks in Opus' loan portfolio; and

k. Gordon knew that he pressured employees to close loans at any cost, regardless of risk, as explained in paragraph 71.

96. On August 7, 2015, Opus filed with the FDIC its quarterly report on Form 10-Q for the second quarter of 2015 ("2Q 2015 10-Q), signed by Gordon. The 2Q 2015 10-Q represented that due to the growth in Commercial Banking loans, ***"we have also emphasized our funding strategy towards commercial business loans with similar stringent underwriting criteria and monitoring procedures as part of our efforts to further diversify our originated portfolio."***

97. The bold and italicized text in paragraph 96 regarding Opus' stringent underwriting and monitoring procedures in connection with commercial business loans was false and misleading and omitted material facts because (1) Opus' credit culture was aggressive and not conservative; (2) Opus' credit controls, including the Bank's purported credit monitoring, were either disregarded or ineffective at identifying problem loans; (3) Opus was underwriting risky loans to entities with little to no cash flow or collateral; and (4) Opus ramped up enterprise value lending in the fourth quarter of 2014. Defendants knew or recklessly disregarded that these statements were false and misleading because:

a. the Bank's public filings during the Class Period admit that Defendants reviewed "monthly loan monitoring reports" that included a "variety of loan portfolio metrics and highlight[ed] existing or potential issues" within the portfolio;

b. throughout the Class Period, the Bank had quarterly bank-wide credit review meetings during which PLRs were discussed, as described by CW2 in paragraphs 54 and 55;

c. Defendants had access to CreditQuest and could easily generate a risk rating report for all loans in the Bank's portfolio as described by CW3 in paragraph 66;

d. the Bank's public filings during the Class Period admit that the Bank conducted semi-annual stress tests of the entire loan portfolio;

e. the Bank's public filings during the Class Period admit that the Bank conducted regular reviews of its loan portfolio to monitor compliance with loan covenants and to determine appropriate loan risk rating;

f. the Bank's public filings during the Class Period admit that the Bank actively monitors loans that management believes indicate additional potential credit risk;

g. as explained by CW4 in paragraph 73, Gordon often made the final determination on terms and pricing of a loan and interacted directly with bankers in the Commercial Bank in doing so;

h. as explained in paragraph 63, enterprise value loans were discussed during a Board meeting in 2014 attended by CW2, and Gordon was a member of the Board at that time;

i. Allison had access to numerous reports demonstrating the true credit quality of Opus' portfolio, including PLRs as explained by CW1 in paragraphs 47 and 50;

j. Allison was required to approve any loan that deviated from Bank guidelines as explained by CW1 in paragraph 48 and therefore was aware of or recklessly disregarded the true nature of credit risks in Opus' loan portfolio; and

k. Gordon knew that he pressured employees to close loans at any cost, regardless of risk, as explained in paragraph 71.

98. On October 26, 2015, the Bank conducted a quarterly earnings call to discuss its third quarter 2015 financial results. Defendants again emphasized the Bank's growth, but assured investors it was occurring with credit quality in mind. For example, Gordon stated, "While we are proud of Opus' industry leading growth, ***we remain focused on*** profitability and ***maintaining our strong credit culture*** …. Our quarterly new loan fundings, high quality deposits, ***conservative approach to credit***, strong capital ratios and scalable business give us confidence as we head towards 2016." Allison added, "[A]s we continue to find success growing originations, ***we are maintaining our focus on disciplined credit culture.***"

99. Further, in response to a question concerning the increase in non-performing loans, Allison and Gordon represented that there was no negative credit trend within the Bank's portfolio:

> **A:** (Allison) I would say, though, that our practice is to set covenant expectations at a relatively aggressive level, and so as we see companies failing to achieve, if you will, to that standard I won't say we're quick ***but we're not hesitant to down grade the relationship, and while we don't necessarily expect that to culminate in credit loss,*** that aggressiveness does impact the allowance.
>
> ****
>
> **A:** (Gordon) So, . . . just like a year ago in the third quarter of 2014, ***we do not at all view this, the movement that we had***

> ***during the quarter as some sort of trend for people to extrapolate from.***

100. The bolded and italicized text in paragraphs 98 and 99 regarding Opus' conservative credit culture and assurances that there were no negative credit trends in Opus' loan portfolio were false and misleading and omitted material facts because (1) Opus' credit culture was aggressive and not conservative; (2) Opus' credit controls, including the Bank's purported credit monitoring, were either disregarded or ineffective at identifying problem loans; (3) Opus was underwriting risky loans to entities with little to no cash flow or collateral; (4) Opus had ramped up enterprise value lending in the fourth quarter of 2014; and (5) there *were* negative credit trends in Opus' loan portfolio. Defendants knew these statements were false and misleading because:

a. the Bank's public filings during the Class Period admit that Defendants reviewed "monthly loan monitoring reports" that included a "variety of loan portfolio metrics and highlight[ed] existing or potential issues" within the portfolio;

b. throughout the Class Period, the Bank had quarterly bank-wide credit review meetings during which PLRs were discussed, as described by CW2 in paragraphs 54 and 55;

c. Defendants had access to CreditQuest and could easily generate a risk rating report for all loans in the Bank's portfolio as described by CW3 in paragraph 66;

d. the Bank's public filings during the Class Period admit that the Bank conducted semi-annual stress tests of the entire loan portfolio;

e. the Bank's public filings during the Class Period admit that the Bank conducted regular reviews of its loan portfolio to monitor compliance with loan covenants and to determine appropriate loan risk rating;

f. the Bank's public filings during the Class Period admit that the Bank actively monitors loans that management believes indicate additional potential credit risk;

g. as explained by CW4 in paragraph 73, Gordon often made the final determination on terms and pricing of a loan and interacted directly with bankers in the Commercial Bank in doing so;

h. as explained in paragraph 63, enterprise value loans were discussed during a Board meeting in 2014 attended by CW2 and Gordon was a member of the Board at that time;

i. Allison had access to numerous reports demonstrating the true credit quality of Opus' portfolio including PLRs as explained by CW1 in paragraphs 47 and 50;

j. Allison was required to approve any loan that deviated from Bank guidelines as explained by CW1 in paragraph 48 and therefore was aware of or recklessly disregarded the true nature of credit risks in Opus' loan portfolio; and

k. Gordon knew that he pressured employees to close loans at any cost, regardless of risk, as explained in paragraph 71.

101. Analysts following the Bank again responded favorably to Defendants' false and misleading statements that despite the increasing provisions for loan losses and non-performing assets, there was no negative credit trend in the Bank's loan portfolio. A October 26, 2015 Sandler O'Neill + Partners' analyst report noted, "The larger provision built the reserve ratio more than we anticipated but ***overall credit metrics remained strong***." An October 26, 2015 Piper Jaffray Analyst Report explained, ***"Management is confident the latest increase [in the provision for loan losses] should not make a trend or necessarily result in losses."***

102. On November 6, 2015, Opus filed with the FDIC its quarterly report on Form 10-Q for the third quarter of 2015 ("3Q 2015 10-Q). The 3Q 2015 10-Q represented that due to the growth in Commercial Banking Loans, "***we have also emphasized our funding strategy towards commercial business loans with similar stringent underwriting criteria and monitoring procedures as part of our efforts to further diversify our originated portfolio.***"

103. The bold and italicized text above in paragraph 102 regarding Opus' stringent underwriting and monitoring procedures in connection with commercial business loans was false and misleading and omitted material facts because (1) Opus' credit culture was aggressive and not conservative; (2) Opus' credit controls, including the Bank's purported credit monitoring, were either disregarded or ineffective at

identifying problem loans; (3) Opus was underwriting risky loans to entities with little to no cash flow or collateral; and (4) Opus ramped up enterprise value lending in the fourth quarter of 2014. Defendants knew or recklessly disregarded that these statements were false and misleading because:

a. the Bank's public filings during the Class Period admit that Defendants reviewed "monthly loan monitoring reports" that included a "variety of loan portfolio metrics and highlight[ed] existing or potential issues" within the portfolio;

b. throughout the Class Period, the Bank had quarterly bank-wide credit review meetings during which PLRs were discussed, as described by CW2 in paragraphs 54 and 55;

c. Defendants had access to CreditQuest and could easily generate a risk rating report for all loans in the Bank's portfolio as described by CW3 in paragraph 66;

d. the Bank's public filings during the Class Period admit that the Bank conducted semi-annual stress tests of the entire loan portfolio;

e. as explained in paragraph 63 enterprise value loans were discussed during a Board meeting in 2014 attended by CW2 and Gordon was a member of the Board at that time;

f. the Bank's public filings during the Class Period admit that the Bank conducted regular reviews of its loan portfolio to monitor compliance with loan covenants and to determine appropriate loan risk rating;

g. the Bank's public filings during the Class Period admit that the Bank actively monitors loans that management believes indicate additional potential credit risk;

h. as explained by CW4 in paragraph 73, Gordon often made the final determination on terms and pricing of a loan and interacted directly with bankers in the Commercial Bank in doing so;

i. Allison had access to numerous reports demonstrating the true credit quality of Opus' portfolio, including PLRs as explained by CW1 in paragraphs 47 and 50;

j. Allison was required to approve any loan that deviated from Bank guidelines as explained by CW1 in paragraph 48 and therefore was aware of or recklessly disregarded the true nature of credit risks in Opus' loan portfolio; and

k. Gordon knew that he pressured employees to close loans at any cost, regardless of risk, as explained in paragraph 71.

104. On December 1, 2015, Opus issued a Quarterly Report. The Report assured investors that the changes in reserves and risk rating migrations over the third quarter of 2015 were a result of the Bank's conservative approach to credit:

> As Opus continues to achieve industry-leading growth rates in loans and deposits, ***it remains focused on profitability and maintaining a disciplined credit culture***.
>
> ****
>
> ***Importantly, quarterly changes in specific reserves and individual risk rating migrations were related to loans from various banking divisions and are largely attributable to Opus' conservative credit culture, which prescribes stringent covenant expectations and robust monitoring processes, enabling management to make proactive and comprehensive credit risk decisions.*** Such trends were anticipated and previously guided, as the growing Commercial and Specialty Banking divisions' portfolios continue to season. Opus' credit infrastructure was established to ensure it stays ahead of situations that may or may not result in past due payments or credit loss.

105. The bolded and italicized text in paragraph 104 regarding Opus' conservative credit culture and robust monitoring processes were false and misleading and omitted material facts because (1) Opus' credit culture was aggressive and not conservative; (2) Opus' credit controls, including the Bank's purported credit monitoring, were either disregarded or ineffective at identifying problem loans; (3) Opus was underwriting risky loans to entities with little to no cash flow or collateral; and (4) Opus ramped up enterprise value lending in the fourth quarter of 2014. Defendants knew or recklessly disregarded that these statements were false and misleading because:

a. the Bank's public filings during the Class Period admit that Defendants reviewed "monthly loan monitoring reports" that included a "variety of loan portfolio metrics and highlight[ed] existing or potential issues" within the portfolio;

b. throughout the Class Period, the Bank had quarterly bank-wide credit review meetings during which PLRs were discussed, as described by CW2 in paragraphs 54 and 55;

c. Defendants had access to CreditQuest and could easily generate a risk rating report for all loans in the Bank's portfolio as described by CW3 in paragraph 66;

d. the Bank's public filings during the Class Period admit that the Bank conducted semi-annual stress tests of the entire loan portfolio;

e. the Bank's public filings during the Class Period admit that the Bank conducted regular reviews of its loan portfolio to monitor compliance with loan covenants and to determine appropriate loan risk rating;

f. the Bank's public filings during the Class Period admit that the Bank actively monitors loans that management believes indicate additional potential credit risk;

g. as explained by CW4 in paragraph 73, Gordon often made the final determination on terms and pricing of a loan and interacted directly with bankers in the Commercial Bank in doing so;

h. as explained in paragraph 63,enterprise value loans were discussed during a Board meeting in 2014 attended by CW2 and Gordon was a member of the Board at that time;

i. Allison had access to numerous reports demonstrating the true credit quality of Opus' portfolio, including PLRs as explained by CW1 in paragraphs 47 and 50;

j. beginning in the fourth quarter of 2015, employees in the CAST department approached the Technology Banking unit about differences in risk calculations for technology loans and CAST department employees were told to disregard the agreement in the loan document when calculating risk;

k. Allison was required to approve any loan that deviated from Bank guidelines as explained by CW1 in paragraph 48 and therefore was aware of or recklessly disregarded the true nature of credit risks in Opus' loan portfolio; and

l. Gordon knew that he pressured employees to close loans at any cost, regardless of risk, as explained in paragraph 71.

106. On January 25, 2016, the Bank conducted a quarterly earnings call to discuss its fourth quarter and full year 2015 financial results. Defendants again emphasized the Bank's growth and credit quality. For example, Gordon stated, "Opus achieved record new loan fundings of $763 million during the fourth quarter, surpassing

our previous all-time high during the prior quarter by 20%. We also achieved new loan fundings of $2.4 billion for the full year 2015, outpacing our previously guided projections for 2015 loan funding of $2.2 billion." But, Gordon assured investors that the Bank remained committed to credit quality even during rapid growth periods, explaining, "While we are proud of Opus' industry-leading growth, we remain ***focused on*** profitability and ***maintaining our strong credit culture.***" Gordon further stated, "Our record quarterly new loan fundings, better than expected annual new loan fundings, growth and improving mix of high quality deposits, ***continued conservative approach to credit***, strong capital ratios, and scalable business give us confidence as we head into 2016."

107. Allison echoed Gordon's comments, explaining, "As we continue to find success growing originations, ***we also continue to maintain our focus on a disciplined credit culture, including active portfolio management***. . . . ***The increase in non-performing assets during the fourth quarter was driven by one loan relationship, for which Opus has confirmed there is sufficient collateral to cover expected future inherent loss***."

108. In response to a question regarding what was driving the Bank's increase in reserves, Allison explained:

> It's actually, it's two loans to one relationship, and it's totally, completely collateralized. ***And so the loss content isn't something that we're worried about***. But you're seeing it in and reflected by our allowance, our NPA's [non-performing assets], our criticized, our classified, because they are large loans relative to the size of our book.

109. The bolded and italicized statements in paragraphs 106-108 regarding Opus' disciplined credit culture, active portfolio monitoring, and assurances that the increase in non-performing assets was not worrisome were false and misleading and

omitted material facts because (1) Opus' credit culture was aggressive and not conservative; (2) Opus' credit controls, including the Bank's purported credit monitoring, were either disregarded or ineffective at identifying problem loans; (3) Opus was underwriting risky loans to entities with little to no cash flow or collateral; (4) Opus had ramped up enterprise value lending in the fourth quarter of 2014; and (5) there were negative credit trends in Opus' loan portfolio. Defendants knew or recklessly disregarded that these statements were false and misleading because:

a. the Bank's public filings during the Class Period admit that Defendants reviewed "monthly loan monitoring reports" that included a "variety of loan portfolio metrics and highlight[ed] existing or potential issues" within the portfolio;

b. throughout the Class Period, the Bank had quarterly bank-wide credit review meetings during which PLRs were discussed, as described by CW2 in paragraphs 54 and 55;

c. Defendants had access to CreditQuest and could easily generate a risk rating report for all loans in the Bank's portfolio as described by CW3 in paragraph 66;

d. the Bank's public filings during the Class Period admit that the Bank conducted semi-annual stress tests of the entire loan portfolio;

e. the Bank's public filings during the Class Period admit that the Bank conducted regular reviews of its loan portfolio to monitor compliance with loan covenants and to determine appropriate loan risk rating;

f. the Bank's public filings during the Class Period admit that the Bank actively monitors loans that management believes indicate additional potential credit risk;

g. as explained by CW4 in paragraph 73, Gordon often made the final determination on terms and pricing of a loan and interacted directly with bankers in the Commercial Bank in doing so;

h. as explained in paragraph 63, enterprise value loans were discussed during a Board meeting in 2014 attended by CW2 and Gordon was a member of the Board at that time;

i. Allison had access to numerous reports demonstrating the true credit quality of Opus' portfolio, including PLRs as explained by multiple CW1 in paragraphs 47 and 50;

j. beginning in the fourth quarter of 2015, employees in the CAST department approached the Technology Banking unit about differences in risk calculations for technology loans and CAST department employees were told to disregard the agreement in the loan document when calculating risk;

k. Allison was required to approve any loan that deviated from Bank guidelines as explained by CW1 in paragraph 48 and therefore was aware of or recklessly disregarded the true nature of credit risks in Opus' loan portfolio;

l. in 2015, Gordon expressed concerns about the quality of the Bank's portfolio during a weekly sales call attended by CW2 as explained in paragraph 62;

m. in 2015, Gordon had a one-on-one meeting with CW2 to discuss a problem loan in the Healthcare Banking unit as described in paragraph 59;

n. Gordon knew that he pressured employees to close loans at any cost, regardless of risk, as explained in paragraph 71; and

o. Opus admitted that at least during the year ended December 31, 2016, it had material weaknesses in internal controls over financial reporting related to inadequate review of the allowance for loan losses and inadequate scope of the internal credit function. The root cause of the material weakness related to Opus' failure to have sufficiently qualified personnel reviewing impaired loans. Opus further admitted it had inadequate knowledge of relevant regulations governing the identification of charge-offs on impaired loans, ineffective review over the evaluation of specific reserves and/or charge-offs on impaired loans, inadequate support for assumptions used in the determination of the allowance for loan losses on impaired loans, and that the internal credit function did not have a process in place to make timely changes to the review scope and procedures as credit quality began to deteriorate.

110. On February 29, 2016, Opus filed with the FDIC its annual report on Form 10-K for full fiscal year 2015 ("2015 10-K"), signed by Gordon. The 2015 10-K provided that "***we have put into place stringent underwriting criteria related to our commercial real estate, multifamily residential and commercial business loans,***

***including stress, downside and break-even analysis, as well as monitoring procedures, including quarterly market evaluations and semi-annual loan portfolio stress testing.***"

111. The bold and italicized text above in paragraph 110 regarding Opus' stringent underwriting and monitoring procedures in connection with commercial business loans was false and misleading and omitted material facts because (1) Opus' credit culture was aggressive and not conservative; (2) Opus' credit controls, including the Bank's purported credit monitoring, were either disregarded or ineffective at identifying problem loans; (3) Opus was underwriting risky loans to entities with little to no cash flow or collateral; and (4) Opus ramped up enterprise value lending in the fourth quarter of 2014. Defendants knew or recklessly disregarded that these statements were false and misleading because:

a. the Bank's public filings during the Class Period admit that Defendants reviewed "monthly loan monitoring reports" that included a "variety of loan portfolio metrics and highlight[ed] existing or potential issues" within the portfolio;

b. throughout the Class Period, the Bank had quarterly bank-wide credit review meetings during which PLRs were discussed, as described by CW2 in paragraphs 54 and 55;

c. Defendants had access to CreditQuest and could easily generate a risk rating report for all loans in the Bank's portfolio as described by CW3 in paragraph 66;

d. the Bank's public filings during the Class Period admit that the Bank conducted semi-annual stress tests of the entire loan portfolio;

e. the Bank's public filings during the Class Period admit that the Bank conducted regular reviews of its loan portfolio to monitor compliance with loan covenants and to determine appropriate loan risk rating;

f. the Bank's public filings during the Class Period admit that the Bank actively monitors loans that management believes indicate additional potential credit risk;

g. as explained by CW4 in paragraph 73, Gordon often made the final determination on terms and pricing of a loan and interacted directly with bankers in the Commercial Bank in doing so;

h. as explained in paragraph 63, enterprise value loans were discussed during a Board meeting in 2014 attended by CW2 and Gordon was a member of the Board at that time;

i. Allison had access to numerous reports demonstrating the true credit quality of Opus' portfolio, including PLRs as explained by multiple CW1 in paragraphs 47 and 50;

j. beginning in the fourth quarter of 2015, employees in the CAST department approached the Technology Banking unit about differences in risk calculations for technology loans and CAST department employees were told to disregard the agreement in the loan document when calculating risk;

k. Allison was required to approve any loan that deviated from Bank guidelines as explained by CW1 in paragraph 48 and therefore was aware of or recklessly disregarded the true nature of credit risks in Opus' loan portfolio;

l. in 2015, Gordon expressed concerns about the quality of the Bank's portfolio during a weekly sales call attended by CW2 as explained in paragraph 62;

m. in 2015, Gordon had a one-on-one meeting with CW2 to discuss a problem loan in the Healthcare Banking unit as explained in paragraph 59;

n. Gordon knew that he pressured employees to close loans at any cost, regardless of risk, as explained in paragraph 71;and

o. Opus admitted that at least during the year ended December 31, 2016, it had material weaknesses in internal controls over financial reporting related to inadequate review of the allowance for loan losses and inadequate scope of the internal credit function. The root cause of the material weakness related to Opus' failure to have sufficiently qualified personnel reviewing impaired loans. Opus further admitted it had inadequate knowledge of relevant regulations governing the identification of charge-offs on impaired loans, ineffective review over the evaluation of specific reserves and/or charge-offs on impaired loans, inadequate support for assumptions used in the determination of the allowance for loan losses on impaired loans, and that the internal credit function did not have a process in place to make timely changes to the review scope and procedures as credit quality began to deteriorate.

112. On April 1, 2016, Opus issued a Quarterly Report. The Report assured investors that Opus was committed to a strong credit culture, stating in relevant part:

> ***As Opus continues to achieve industry-leading growth rates in loans and deposits, it remains focused on profitability and maintaining a disciplined credit culture***. . . . The increase in nonperforming assets during the fourth quarter of 2015 was driven by a single loan relationship for which Opus has confirmed it has sufficient collateral to cover expected future inherent loss.
>
> ****
>
> The provision for changes in specific reserves and risk ratings during the fourth quarter of 2015 was predominately additional amounts of existing problem assets for activity in the fourth quarter of 2015 and not related to newly identified problem assets during the quarter. . . . ***Importantly, quarterly changes in specific reserves and individual risk rating migrations were related to loans from various banking divisions and are largely attributable to Opus' conservative credit culture***, ***which prescribes stringent covenant expectations and robust monitoring processes***, enabling management to make proactive and comprehensive credit risk decisions.

113. The bolded and italicized text in paragraph 112 regarding Opus' conservative credit culture and robust monitoring processes was false and misleading and omitted material facts because (1) Opus' credit culture was aggressive and not conservative; (2) Opus' credit controls, including the Bank's purported credit monitoring, were either disregarded or ineffective at identifying problem loans; (3) Opus was underwriting risky loans to entities with little to no cash flow or collateral; and (4) Opus ramped up enterprise value lending in the fourth quarter of 2014. Defendants knew or recklessly disregarded that these statements were false and misleading because:

a. the Bank's public filings during the Class Period admit that Defendants reviewed "monthly loan monitoring reports" that included a "variety of loan portfolio metrics and highlight[ed] existing or potential issues" within the portfolio;

b. throughout the Class Period, the Bank had quarterly bank-wide credit review meetings during which PLRs were discussed, as described by CW2 in paragraphs 54 and 55;

c. Defendants had access to CreditQuest and could easily generate a risk rating report for all loans in the Bank's portfolio as described by CW3 in paragraph 66;

d. the Bank's public filings during the Class Period admit that the Bank conducted semi-annual stress tests of the entire loan portfolio;

e. the Bank's public filings during the Class Period admit that the Bank conducted regular reviews of its loan portfolio to monitor compliance with loan covenants and to determine appropriate loan risk rating;

f. the Bank's public filings during the Class Period admit that the Bank actively monitors loans that management believes indicate additional potential credit risk;

g. as explained by CW4 in paragraph 73, Gordon often made the final determination on terms and pricing of a loan and interacted directly with bankers in the Commercial Bank in doing so;

h. as explained in paragraph 63, enterprise value loans were discussed during a Board meeting in 2014 attended by CW2 and Gordon was a member of the Board at that time;

i. Allison had access to numerous reports demonstrating the true credit quality of Opus' portfolio, including PLRs as explained by CW1 in paragraphs 47 and 50;

j. beginning in the fourth quarter of 2015, employees in the CAST department approached the Technology Banking unit about differences in risk calculations for technology loans and CAST department employees were told to disregard the agreement in the loan document when calculating risk;

k. Allison was required to approve any loan that deviated from Bank guidelines as explained by CW1 in paragraph 48 and therefore was aware of or recklessly disregarded the true nature of credit risks in Opus' loan portfolio;

l. in 2015, Gordon expressed concerns about the quality of the Bank's portfolio during a weekly sales call attended by CW2 as explained in paragraph 62;

m. in 2015, Gordon had a one-on-one meeting with CW2 to discuss a problem loan in the Healthcare Banking unit as explained in paragraph 59;

n. Gordon knew that he pressured employees to close loans at any cost, regardless of risk, as explained in paragraph 71; and

o. Opus admitted that at least during the year ended December 31, 2016, it had material weaknesses in internal controls over financial reporting related to inadequate review of the allowance for loan losses and inadequate scope of the internal credit function. The root cause of the material weakness related to Opus' failure to have sufficiently qualified personnel reviewing impaired loans. Opus further admitted it had inadequate knowledge of relevant regulations governing the identification of charge-offs on impaired loans, ineffective review over the evaluation of specific reserves and/or charge-offs on impaired loans, inadequate support for assumptions used in the determination of the allowance for loan losses on impaired loans, and that the internal credit function did not have a process in place to make timely changes to the review scope and procedures as credit quality began to deteriorate.

114. On April 25, 2016, the Bank conducted a quarterly earnings call to discuss its first quarter 2016 financial results. Defendants again emphasized the Bank's growth and credit quality. Gordon explained:

> While we're proud of Opus' industry-leading growth and the successes we're seeing in diversifying our revenue stream, ***we remain focused on . . . maintaining our strong credit culture.***
>
> ****
>
> Our record levels of first-quarter new loan fundings and commitments originated, our increasingly high-quality deposit banks, ***continued conservative approach to credit***, strong capital position, and scalable business give us confidence that 2016 will result in an even stronger performance than 2015's results.

115. Additionally, Allison assured investors that even though there was an increase in the Bank's ratio of non-performing assets during the first quarter there was no larger trend in the overall credit quality of the Bank:

> The linked-quarter increase in nonperforming assets was attributable to one loan relationship in our tech portfolio that is current but was placed on nonaccrual due to developments

> during the quarter, and did not result in a need for any additional allowance. ***I do want to stress that this quarter's increase in NPA ratio was not seen as an indication of a trend in our credit quality.***
>
> ***We continue to maintain our focus on a disciplined approach to credit that includes active portfolio management and may include quarter-to-quarter changes in risk or accrual based on our stringent proactive underwriting standards.***

116. The bolded and italicized text in paragraphs 114 and 115 regarding Opus' disciplined credit culture, stringent underwriting, active portfolio monitoring, and assurances that there were no negative trends in Opus' loan portfolio were false and misleading and omitted material facts because (1) Opus' credit culture was aggressive and not conservative; (2) Opus' credit controls, including the Bank's purported credit monitoring, were either disregarded or ineffective at identifying problem loans; (3) Opus was underwriting risky loans to entities with little to no cash flow or collateral; (4) Opus had ramped up enterprise value lending in the fourth quarter of 2014; and (5) there *were* negative credit trends in Opus' loan portfolio. Defendants knew these statements were false and misleading because:

a. the Bank's public filings during the Class Period admit that Defendants reviewed "monthly loan monitoring reports" that included a "variety of loan portfolio metrics and highlight[ed] existing or potential issues" within the portfolio;

b. throughout the Class Period, the Bank had quarterly bank-wide credit review meetings during which PLRs were discussed, as described by CW2 in paragraphs 54 and 55;

c. Defendants had access to CreditQuest and could easily generate a risk rating report for all loans in the Bank's portfolio as described by CW3 in paragraph 66;

d. the Bank's public filings during the Class Period admit that the Bank conducted semi-annual stress tests of the entire loan portfolio;

e. the Bank's public filings during the Class Period admit that the Bank conducted regular reviews of its loan portfolio to monitor compliance with loan covenants and to determine appropriate loan risk rating;

f. the Bank's public filings during the Class Period admit that the Bank actively monitors loans that management believes indicate additional potential credit risk;

g. as explained by CW4 in paragraph 73, Gordon often made the final determination on terms and pricing of a loan and interacted directly with bankers in the Commercial Bank in doing so;

h. as explained in paragraph 63, enterprise value loans were discussed during a Board meeting in 2014 attended by CW2 and Gordon was a member of the Board at that time;

i. Allison had access to numerous reports demonstrating the true credit quality of Opus' portfolio, including PLRs as explained by CW1 in paragraphs 47 and 50;

j. beginning in the fourth quarter of 2015, employees in the CAST department approached the Technology Banking unit about differences in risk calculations for technology loans and CAST department employees were told to disregard the agreement in the loan document when calculating risk;

k. Allison was required to approve any loan that deviated from Bank guidelines as explained by CW1 in paragraph 48 and therefore was aware of or recklessly disregarded the true nature of credit risks in Opus' loan portfolio;

l. in 2015, Gordon expressed concerns about the quality of the Bank's portfolio during a weekly sales call attended by CW2 in paragraph 62;

m. in 2015, Gordon had a one-on-one meeting with CW2 to discuss a problem loan in the Healthcare Banking unit as explained in paragraph 59;

n. Gordon knew that he pressured employees to close loans at any cost, regardless of risk, as explained in paragraph 71; and

o. Opus admitted that at least during the year ended December 31, 2016, it had material weaknesses in internal controls over financial reporting related to inadequate review of the allowance for loan losses and inadequate scope of the internal credit function. The root cause of the material weakness related to Opus' failure to have sufficiently qualified personnel reviewing impaired loans. Opus further admitted it had inadequate knowledge of relevant regulations governing the identification of charge-offs on impaired loans,

> ineffective review over the evaluation of specific reserves and/or charge-offs on impaired loans, inadequate support for assumptions used in the determination of the allowance for loan losses on impaired loans, and that the internal credit function did not have a process in place to make timely changes to the review scope and procedures as credit quality began to deteriorate.

117. The market again responded favorably to Defendants' false and misleading statements that the Bank's credit culture remained disciplined and the increase in non-performing assets was not indicative of a larger trend. An April 26, 2016 J.P. Morgan analyst report explained that ***"the one credit that drove the NPA increase in the quarter was a technology company, although mgmt. noted that this was a specific case, and they did not see a read-through weakness in their tech clients. The credit is already adequately reserved for."***

118. On May 6, 2016, Opus filed with the FDIC its quarterly report on Form 10-Q for the first quarter of 2016 ("1Q 2016 10-Q), signed by Gordon. The 1Q 2016 10-Q represented that due to the growth in Commercial Banking, "***we have also emphasized our funding strategy towards commercial business loans with similar stringent underwriting criteria and monitoring procedures as part of our efforts to further diversify our originated portfolio***."

119. The bold and italicized text in paragraph 118 regarding Opus' stringent underwriting and monitoring procedures in connection with commercial business loans was false and misleading and omitted material facts because (1) Opus' credit culture was aggressive and not conservative; (2) Opus' credit controls, including the Bank's purported credit monitoring, were either disregarded or ineffective at identifying problem loans; (3) Opus was underwriting risky loans to entities with little to no cash flow or collateral; and (4) Opus ramped up enterprise value lending in the fourth quarter of 2014. Defendants knew or recklessly disregarded that these statements were false and misleading because:

a. the Bank's public filings during the Class Period admit that Defendants reviewed "monthly loan monitoring reports" that included a "variety of loan portfolio metrics and highlight[ed] existing or potential issues" within the portfolio;

b. throughout the Class Period, the Bank had quarterly bank-wide credit review meetings during which PLRs were discussed, as described by CW2 in paragraphs 54 and 55;

c. Defendants had access to CreditQuest and could easily generate a risk rating report for all loans in the Bank's portfolio as described by CW3 in paragraph 66;

d. the Bank's public filings during the Class Period admit that the Bank conducted semi-annual stress tests of the entire loan portfolio;

e. the Bank's public filings during the Class Period admit that the Bank conducted regular reviews of its loan portfolio to monitor compliance with loan covenants and to determine appropriate loan risk rating;

f. the Bank's public filings during the Class Period admit that the Bank actively monitors loans that management believes indicate additional potential credit risk;

g. as explained by CW4 in paragraph 73, Gordon often made the final determination on terms and pricing of a loan and interacted directly with bankers in the Commercial Bank in doing so;

h. as explained in paragraph 63, enterprise value loans were discussed during a Board meeting in 2014 attended by CW2 and Gordon was a member of the Board at that time;

i. Allison had access to numerous reports demonstrating the true credit quality of Opus' portfolio, including PLRs as explained by CW1 in paragraphs 47 and 50;

j. beginning in the fourth quarter of 2015, employees in the CAST department approached the Technology Banking unit about differences in risk calculations for technology loans and CAST department employees were told to disregard the agreement in the loan document when calculating risk;

k. Allison was required to approve any loan that deviated from Bank guidelines as explained by CW1 in paragraph 48 and therefore was aware of or recklessly disregarded the true nature of credit risks in Opus' loan portfolio;

l. in 2015, Gordon expressed concerns about the quality of the Bank's portfolio during a weekly sales call attended by CW2 as explained in paragraph 62;

m. in 2015, Gordon had a one-on-one meeting with CW2 to discuss a problem loan in the Healthcare Banking unit as explained in paragraph 59;

n. Gordon knew that he pressured employees to close loans at any cost, regardless of risk, as explained in paragraph 71; and

o. Opus admitted that at least during the year ended December 31, 2016, it had material weaknesses in internal controls over financial reporting related to inadequate review of the allowance for loan losses and inadequate scope of the internal credit function. The root cause of the material weakness related to Opus' failure to have sufficiently qualified personnel reviewing impaired loans. Opus further admitted it had inadequate knowledge of relevant regulations governing the identification of charge-offs on impaired loans, ineffective review over the evaluation of specific reserves and/or charge-offs on impaired loans, inadequate support for assumptions used in the determination of the allowance for loan losses on impaired loans, and that the internal credit function did not have a process in place to make timely changes to the review scope and procedures as credit quality began to deteriorate.

120. On May 16, 2016, Opus issued a Quarterly Report. The Report assured investors that Opus was committed to a strong credit culture, stating in relevant part:

> ***As Opus continues to achieve industry-leading growth rates in loans and deposits, it remains focused on maintaining a disciplined credit culture***.
>
> ****
>
> ***Importantly, quarterly changes in specific reserves and individual risk rating migrations were related to loans from various banking divisions and are largely attributable to Opus' conservative credit culture***, ***which prescribes stringent covenant expectations and active monitoring processes***, enabling management to make proactive and comprehensive credit risk decisions.

121. The bolded and italicized text in paragraph 120 regarding Opus' conservative credit culture and robust monitoring processes were false and misleading and omitted material facts because (1) Opus' credit culture was aggressive and not conservative; (2) Opus' credit controls, including the Bank's purported credit

monitoring, were either disregarded or ineffective at identifying problem loans; (3) Opus was underwriting risky loans to entities with little to no cash flow or collateral; and (4) Opus ramped up enterprise value lending in the fourth quarter of 2014. Defendants knew or recklessly disregarded that these statements were false and misleading because:

a. the Bank's public filings during the Class Period admit that Defendants reviewed "monthly loan monitoring reports" that included a "variety of loan portfolio metrics and highlight[ed] existing or potential issues" within the portfolio;

b. throughout the Class Period, the Bank had quarterly bank-wide credit review meetings during which PLRs were discussed, as described by CW2 in paragraphs 54 and 55;

c. Defendants had access to CreditQuest and could easily generate a risk rating report for all loans in the Bank's portfolio as described by CW3 in paragraph 66;

d. the Bank's public filings during the Class Period admit that the Bank conducted semi-annual stress tests of the entire loan portfolio;

e. the Bank's public filings during the Class Period admit that the Bank conducted regular reviews of its loan portfolio to monitor compliance with loan covenants and to determine appropriate loan risk rating;

f. the Bank's public filings during the Class Period admit that the Bank actively monitors loans that management believes indicate additional potential credit risk;

g. as explained by CW4 in paragraph 73, Gordon often made the final determination on terms and pricing of a loan and interacted directly with bankers in the Commercial Bank in doing so;

h. as explained in paragraph 63, enterprise value loans were discussed during a Board meeting in 2014 attended by CW2 and Gordon was a member of the Board at that time;

i. Allison had access to numerous reports demonstrating the true credit quality of Opus' portfolio, including PLRs as explained by CW1 in paragraphs 47 and 50;

j. beginning in the fourth quarter of 2015, employees in the CAST department approached the Technology Banking unit about differences in risk calculations for technology loans and CAST department employees were told to disregard the agreement in the loan document when calculating risk;

k. Allison was required to approve any loan that deviated from Bank guidelines as explained by CW1 in paragraph 48 and therefore was aware of or recklessly disregarded the true nature of credit risks in Opus' loan portfolio;

l. in 2015, Gordon expressed concerns about the quality of the Bank's portfolio during a weekly sales call attended by CW2 as explained in paragraph 62;

m. in 2015, Gordon had a one-on-one meeting with CW2 to discuss a problem loan in the Healthcare Banking unit as explained in paragraph 59;

n. Gordon knew that he pressured employees to close loans at any cost, regardless of risk, as explained in paragraph 71; and

o. Opus admitted that at least during the year ended December 31, 2016, it had material weaknesses in internal controls over financial reporting related to inadequate review of the allowance for loan losses and inadequate scope of the internal credit function. The root cause of the material weakness related to Opus' failure to have sufficiently qualified personnel reviewing impaired loans. Opus further admitted it had inadequate knowledge of relevant regulations governing the identification of charge-offs on impaired loans, ineffective review over the evaluation of specific reserves and/or charge-offs on impaired loans, inadequate support for assumptions used in the determination of the allowance for loan losses on impaired loans, and that the internal credit function did not have a process in place to make timely changes to the review scope and procedures as credit quality began to deteriorate.

122. On July 25, 2016, Opus issued a press release announcing earnings for the second quarter of 2016. Further, the press release included a quote by Gordon, which explained:

> [The second quarter of 2016 was] marked by elevated provision for potential loan losses associated with Opus' Technology Banking division loans, as well as provisions required due to our record second-quarter new loan fundings and continued success shifting the mix of our loan portfolio more heavily towards C&I loans. . . . Given the recent volatility in the Tech markets, this quarter's resultant low risk-adjusted returns experienced in our Tech lending division, and that Opus' second quarter earnings were masked in part by

> provisions due to downgrade-related movements in this portfolio, we've determined here at the start of the current third quarter to deemphasize our Technology Banking niche lending focus for the foreseeable future, and thereby unleash Opus' true earnings potential.

123. Also on July 25, 2016, the Bank conducted a quarterly earnings call to discuss its first quarter 2016 financial results. Defendants again emphasized the Bank's growth and credit quality despite the issues within the technology portfolio. Allison explained:

> Excluding the technology banking division's credit issues, our credit quality continues to perform consistent with expectations as our portfolio of multi-family, CRE and C&I loans continues to season. To put some figures around that statement, if you exclude technology banking division loans from the calculation, our NPA ratio would have been 43 basis points for the second quarter compared to 32 basis points in the first quarter, again excluding tech. We believe our proactive and timely decision to deemphasize our tech lending niche focus will result in a return to the credit profile that we have expected over the course of Opus' evolution. ***That is to say we continue to maintain our focus on a disciplined approach to credit that includes active portfolio management and may include quarter-to-quarter change in risk ratings or accrual status based on our stringent proactive underwriting standards.***

124. The bolded and italicized text in paragraph 123 regarding Opus' disciplined approach to credit, active portfolio management, and stringent underwriting standards was false and misleading and omitted material facts because (1) Opus' credit culture was aggressive and not conservative; (2) Opus' credit controls, including the Bank's purported credit monitoring, were either disregarded or ineffective at identifying problem loans; (3) Opus was underwriting risky loans to entities with little to no cash flow or collateral; and (4) Opus ramped up enterprise value lending in the fourth quarter

of 2014. Defendants knew or recklessly disregarded that these statements were false and misleading because:

a. the Bank's public filings during the Class Period admit that Defendants reviewed "monthly loan monitoring reports" that included a "variety of loan portfolio metrics and highlight[ed] existing or potential issues" within the portfolio;

b. throughout the Class Period, the Bank had quarterly bank-wide credit review meetings during which PLRs were discussed, as described by CW2 in paragraphs 54 and 55;

c. Defendants had access to CreditQuest and could easily generate a risk rating report for all loans in the Bank's portfolio as described by CW3 in paragraph 66;

d. the Bank's public filings during the Class Period admit that the Bank conducted semi-annual stress tests of the entire loan portfolio;

e. the Bank's public filings during the Class Period admit that the Bank conducted regular reviews of its loan portfolio to monitor compliance with loan covenants and to determine appropriate loan risk rating;

f. the Bank's public filings during the Class Period admit that the Bank actively monitors loans that management believes indicate additional potential credit risk;

g. as explained by CW4 in paragraph 73, Gordon often made the final determination on terms and pricing of a loan and interacted directly with bankers in the Commercial Bank in doing so;

h. as explained in paragraph 63, enterprise value loans were discussed during a Board meeting in 2014 attended by CW2 and Gordon was a member of the Board at that time;

i. Allison had access to numerous reports demonstrating the true credit quality of Opus' portfolio, including PLRs as explained CW1 in paragraphs 47 and 50;

j. beginning in the fourth quarter of 2015, employees in the CAST department approached the Technology Banking unit about differences in risk calculations for technology loans and CAST department employees were told to disregard the agreement in the loan document when calculating risk;

k. Allison was required to approve any loan that deviated from Bank guidelines as explained by CW1 in paragraph 48 and therefore was aware of or recklessly disregarded the true nature of credit risks in Opus' loan portfolio;

l. in 2015, Gordon expressed concerns about the quality of the Bank's portfolio during a weekly sales call attended by CW2 as explained in paragraph 62;

m. in 2015, Gordon had a one-on-one meeting with CW2 to discuss a problem loan in the Healthcare Banking unit as explained in paragraph 59;

n. Gordon knew that he pressured employees to close loans at any cost, regardless of risk, as explained in paragraph 71; and

o. Opus admitted that at least during the year ended December 31, 2016, it had material weaknesses in internal controls over financial reporting related to inadequate review of the allowance for loan losses and inadequate scope of the internal credit function. The root cause of the material weakness related to Opus' failure to have sufficiently qualified personnel reviewing impaired loans. Opus further admitted it had inadequate knowledge of relevant regulations governing the identification of charge-offs on impaired loans, ineffective review over the evaluation of specific reserves and/or charge-offs on impaired loans, inadequate support for assumptions used in the determination of the allowance for loan losses on impaired loans, and that the internal credit function did not have a process in place to make timely changes to the review scope and procedures as credit quality began to deteriorate.

125. On August 5, 2016, Opus filed with the FDIC its quarterly report on Form 10-Q for the second quarter of 2016 ("2Q 2016 10-Q), signed by Gordon. The 2Q 2016 10-Q also represented that due to the growth in Commercial Banking, ***"we have also emphasized our funding strategy towards commercial business loans with similar stringent underwriting criteria and monitoring procedures as part of our efforts to further diversify our originated portfolio."***

126. The bold and italicized text above in paragraph 125 regarding Opus' stringent underwriting and monitoring procedures in connection with commercial business loans was false and misleading and omitted material facts because (1) Opus' credit culture was aggressive and not conservative; (2) Opus' credit controls, including the Bank's purported credit monitoring, were either disregarded or ineffective at identifying problem loans; (3) Opus was underwriting risky loans to entities with little to

no cash flow or collateral; and (4) Opus ramped up enterprise value lending in the fourth quarter of 2014. Defendants knew or recklessly disregarded that these statements were false and misleading because:

a. the Bank's public filings during the Class Period admit that Defendants reviewed "monthly loan monitoring reports" that included a "variety of loan portfolio metrics and highlight[ed] existing or potential issues" within the portfolio;
b. throughout the Class Period, the Bank had quarterly bank-wide credit review meetings during which PLRs were discussed, as described by CW2 in paragraphs 54 and 55;
c. Defendants had access to CreditQuest and could easily generate a risk rating report for all loans in the Bank's portfolio as described by CW3 in paragraph 66;
d. the Bank's public filings during the Class Period admit that the Bank conducted semi-annual stress tests of the entire loan portfolio;
e. the Bank's public filings during the Class Period admit that the Bank conducted regular reviews of its loan portfolio to monitor compliance with loan covenants and to determine appropriate loan risk rating;
f. the Bank's public filings during the Class Period admit that the Bank actively monitors loans that management believes indicate additional potential credit risk;
g. as explained by CW4 in paragraph 73, Gordon often made the final determination on terms and pricing of a loan and interacted directly with bankers in the Commercial Bank in doing so;
h. as explained in paragraph 63, enterprise value loans were discussed during a Board meeting in 2014 attended by CW2 and Gordon was a member of the Board at that time;
i. Allison had access to numerous reports demonstrating the true credit quality of Opus' portfolio, including PLRs as explained by CW1 in paragraphs 47 and 50;
j. beginning in the fourth quarter of 2015, employees in the CAST department approached the Technology Banking unit about differences in risk calculations for technology loans and CAST department employees were told to disregard the agreement in the loan document when calculating risk;
k. Allison was required to approve any loan that deviated from Bank guidelines as explained by CW1 in paragraph 48 and therefore was

aware of or recklessly disregarded the true nature of credit risks in Opus' loan portfolio;

l. in 2015, Gordon expressed concerns about the quality of the Bank's portfolio during a weekly sales call attended by CW2 as explained in paragraph 62;

m. in 2015, Gordon had a one-on-one meeting with CW2 to discuss a problem loan in the Healthcare Banking unit as explained in paragraph 59;

n. Gordon knew that he pressured employees to close loans at any cost, regardless of risk, as explained in paragraph 71; and

o. Opus admitted that at least during the year ended December 31, 2016, it had material weaknesses in internal controls over financial reporting related to inadequate review of the allowance for loan losses and inadequate scope of the internal credit function. The root cause of the material weakness related to Opus' failure to have sufficiently qualified personnel reviewing impaired loans. Opus further admitted it had inadequate knowledge of relevant regulations governing the identification of charge-offs on impaired loans, ineffective review over the evaluation of specific reserves and/or charge-offs on impaired loans, inadequate support for assumptions used in the determination of the allowance for loan losses on impaired loans, and that the internal credit function did not have a process in place to make timely changes to the review scope and procedures as credit quality began to deteriorate.

127. On August 3, 2016, the Bank held a KBW Community Investor Conference Call during which Allison stated, ***"So far the credit metrics have held up as we have ambitiously grown over the years."***

128. The bolded and italicized statement in paragraph 127 regarding Opus' credit metrics was false and misleading and omitted material facts because Opus' credit metrics had not held up as Opus grew. Defendants knew this statement was false and misleading because:

a. the Bank's public filings during the Class Period admit that Defendants reviewed "monthly loan monitoring reports" that included a "variety of loan portfolio metrics and highlight[ed] existing or potential issues" within the portfolio;

b. throughout the Class Period, the Bank had quarterly bank-wide credit review meetings during which PLRs were discussed, as described by CW2 in paragraphs 54 and 55;

c. Defendants had access to CreditQuest and could easily generate a risk rating report for all loans in the Bank's portfolio as described by CW3 in paragraph 66;

d. the Bank's public filings during the Class Period admit that the Bank conducted semi-annual stress tests of the entire loan portfolio;

e. the Bank's public filings during the Class Period admit that the Bank conducted regular reviews of its loan portfolio to monitor compliance with loan covenants and to determine appropriate loan risk rating;

f. the Bank's public filings during the Class Period admit that the Bank actively monitors loans that management believes indicate additional potential credit risk;

g. as explained by CW4 in paragraph 73, Gordon often made the final determination on terms and pricing of a loan and interacted directly with bankers in the Commercial Bank in doing so;

h. as explained in paragraph 63, enterprise value loans were discussed during a Board meeting in 2014 attended by CW2 and Gordon was a member of the Board at that time;

i. Allison had access to numerous reports demonstrating the true credit quality of Opus' portfolio, including PLRs as explained by CW1 in paragraphs 47 and 50;

j. beginning in the fourth quarter of 2015, employees in the CAST department approached the Technology Banking unit about differences in risk calculations for technology loans and CAST department employees were told to disregard the agreement in the loan document when calculating risk;

k. Allison was required to approve any loan that deviated from Bank guidelines as explained by CW1 in paragraph 48 and therefore was aware of or recklessly disregarded the true nature of credit risks in Opus' loan portfolio;

l. in 2015, Gordon expressed concerns about the quality of the Bank's portfolio during a weekly sales call attended by CW2 as explained in paragraph 62;

m. in 2015, Gordon had a one-on-one meeting with CW2to discuss a problem loan in the Healthcare Banking unit as explained in paragraph 59;

n. Gordon knew that he pressured employees to close loans at any cost, regardless of risk, as explained in paragraph 71; and

o. Opus admitted that at least during the year ended December 31, 2016, it had material weaknesses in internal controls over financial reporting related to inadequate review of the allowance for loan losses and inadequate scope of the internal credit function. The root cause of the material weakness related to Opus' failure to have sufficiently qualified personnel reviewing impaired loans. Opus further admitted it had inadequate knowledge of relevant regulations governing the identification of charge-offs on impaired loans, ineffective review over the evaluation of specific reserves and/or charge-offs on impaired loans, inadequate support for assumptions used in the determination of the allowance for loan losses on impaired loans, and that the internal credit function did not have a process in place to make timely changes to the review scope and procedures as credit quality began to deteriorate.

## F. <u>The Truth Begins to Emerge</u>

129. On October 17, 2016, prior to the market's open, Opus began to partially revealed the true state of its loan portfolio. On that day, Opus issued a press release announcing that earnings for the third quarter would include a $0.59 per diluted share impact from loan charge-offs of $38.8 million which were expected to result in a net loss of approximately $.05 per diluted share for the third quarter of 2016. The press release explained:

> As part of the credit review process of impaired loans, new developments supported charge-offs being recognized on eight loan relationships through the allowance for loan losses at September 30, 2016. . . . ***Charge-offs for the eight loan relationships totaled $38.8 million. . . . In addition, these charge-offs increased the reserve levels recorded against the remaining portfolio by $13.6 million*** as a result of higher loss factors incorporated into our allowance for loan loss methodology to reflect charge-offs in the third quarter of 2016.

130. The press release further explained that $22.2 million of the charge-offs were from two Technology loans, and the remaining $16.6 million in charge-offs were

made up of "six loan relationships . . . from across our Commercial and Specialty Banking divisions."

131. This partial corrective disclosure came as a shock to the market. An October 17, 2016 JMP Securities analyst report explained:

> ***In a surprise announcement, Opus Bank pre-released a loss per share this morning of $0.05 for 3Q16***. . . . While the press release mentioned that three of the eight loans had been previously discussed on the last conference call, ***we think this announcement will come as a shock to investors and should cast a large shadow over the company's underwriting and risk management in commercial lending and ambitious growth plans long term.***
>
> ****
>
> Two of the loan relationships were in the Tech Banking division, which the company deemphasized in 2Q2016. We note $22.1 million of the charge-offs in 3Q16 were in this lending segment. ***While credit troubles surfaced on the last quarter, management has consistently communicated a message of strength in response to increasing concerns over credit quality in the portfolio. While attending the company's inaugural Investor Day in Irvine, CA on September 8, we had thought management provided some positive commentary on developments on and sentiment around this portfolio and even left the door open to return to this lending segment long term.***
>
> ****
>
> ***Credit troubles are not specific to tech lending. Six loans in the commercial and specialty banking divisions had total charge-offs of $16.6 million***. . . . We note loan growth has been predominately in Opus Bank's commercial and specialty banking divisions. ***We expect investors will subsequently look at the credit quality of this commercial portfolio critically and be highly sensitive to outsized loan growth as a result of this credit issue, going forward. In our view, confidence in this growth story has been shaken for bulls***.

132. An October 17, 2016 Piper Jaffray analyst report also expressed surprise at the announcement:

> ***We are surprised by the news and expect the market to be disappointed*** in the significant amount of loss content realized and the stubbornly stable level of criticized loans.
>
> ***Comes as a surprise to us.*** Coming off the company's Analyst/Investor Day, we were under the impression that one of its tech-related relationships (which contains multiple credit facilities) that was placed on nonaccrual in 2Q16 had shown meaningful improvement more recently and should have resulted in some upgrades.
>
> We do not see any laterals; looks OPB specific to us. ***We do not think the problems Opus is witnessing in its tech, healthcare or other commercial and specialty divisions can be translated to other banks. We believe the problems here relate to being relatively new to these specialty lines of business and the pace of growth***.

133. A separate October 17, 2016 Piper Jaffray analyst report noted that Opus' announcement left many investor questions unanswered, including "what has changed between now and OPB's Investor Day? What has flowed into criticized loans if related balances are flat after these write downs? ***How can we gain increased confidence in management's ability to underwrite non-multifamily credits***? . . . . These are some of the questions that the market is looking for answers to with OPB shares off 10% on Monday and below its IPO price of $30."

134. In response to Opus' October 17, 2016 partial corrective disclosure, Opus' share price ***dropped 7% before the market opened***, to open at $32 per share, down from the prior trading day's closing price of $34.45. Opus' shares continued to plummet throughout trading on October 17, 2016, ultimately closing at $27.20, ***a drop of 15% over the course of the trading day*** on volume of nearly 1.5 million shares. Despite this

partial corrective disclosure, Opus continued to mislead the market by representing that the charge-offs were related to "new developments" for each of the eight loan relationships at issue instead of disclosing that the Bank's loan portfolio had been deteriorating for over a year and that the Bank would need to overhaul its credit infrastructure.

135. On October 19, 2016, Opus held an Investor and Analyst Conference Call to address the Bank's October 17, 2016 announcement regarding loan charge-offs. Defendants did not take live questions during the call; rather, the call was "listen only" with Defendants reading prepared questions and answers designed to allay the concerns of the market and failing to present the full picture of the problems in Opus' loan portfolio. The following questions, among other, were addressed:

> **1. Have you been adequately provisioning for loan losses and can you explain the reserving methodology? (Nicole Carrillo)**
>
> ***We believe we have been consistently and adequately provisioning for loan losses by applying a methodology that has been reviewed by our regulators and our internal and external auditors*.**
>
> ****
>
> **4. Were the charge-offs caused by collateral issues? (Nicole Carrillo)**
>
> ***There was deterioration in the underlying financial performance of the client for each of these loans that led them to be viewed as collateral-dependent***. The shortfall between the collateral value, measured through independent third-party appraisals, enterprise value assessment, or liquidation values, and the loan balance triggered a charge-off when a loss event was confirmed during the third quarter.
>
> ****
>
> **6. What divisions were the eight loan relationships with charge-offs part of? (Michael Allison)**

> ***The charge-offs during the third quarter were comprised of $23.4 million from Technology Banking, $7.5 million from Healthcare Banking, specifically our Practice group, not our Provider loans, $7.1 million from our Commercial Banking division and $2.0 million from Corporate Finance***.
>
> **7. What were the inflows and outflows within total criticized loans that led to the flat quarter-over-quarter level? What risk grading migration took place during the quarter? (Nicole Carrillo)**
>
> Total criticized loans increased by $914,000 quarter-to-quarter. The net change was driven by charge-offs, which reduced the balance by $40 million, upgrades, which reduced the balance by $21.0 million, and downgrades, which increased the balance by $62.0 million. ***The downgrades of $62.0 million were primarily comprised of two loans totaling $23.3 million from Technology Banking, two loans totaling $15.0 million from Commercial Banking, one loan totaling $8.5 million from Healthcare Banking and one loan totaling $11.6 million from Structured Finance.*** Only one loan migrated to substandard, which was from Technology banking.
>
> ****
>
> **10. What changes are being made going forward in terms of processes and structure? (Stephen H. Gordon**)
>
> ***We've committed to specific enhancements to our loan processes, credit monitoring, approval and review, which will be, in part, accomplished through the dedication of deeper talent and resources***. Examples of numerous improvements we will be making include, but are not limited to, ***bifurcating the chief credit officer role into two separate roles: a chief credit officer dedicated to our commercial real estate lending activities and the addition of a chief credit officer dedicated to our commercial and specialty banking C&I focus. We are also going to be lowering our in-house maximum hold limits***, which we believe will reduce the risk of single event impact, ***and lowering approval authority levels***, which we believe will increase scrutiny and oversight in the credit approval process.

136. Opus' revelation continued to shake the market. An October 19, 2016 Sandler O'Neill + Partners analyst report published following the call explained:

> While the call and transcript provided good detail about the qualitative aspects of the acute credit events of the quarter it ***also acknowledged that Opus needs to materially strengthen its credit underwriting and administration practices tied to commercial and specialty C&I lending. . . .The company added it will make specific enhancements to its loan processes, credit monitoring, approval and review which will be, in part, accomplished through the dedication of deeper talent and resources.*** We expect this retooling to really get under way once the new co-credit head has been hired.
>
> ***Two Key Issues Raised.*** We believe the revelation that Opus's credit evaluation and underwriting processes in its commercial and specialty banking units have been proven inadequate raises two important questions about the company's prospects.
>
> - ***First, it calls into question the underlying credit quality of commercial and specialty loans that are now on the balance sheet. . . .***
>
> - ***Second, it calls into question the viability of the company's strategic growth plans***. Management gave no assurances on the call that its aggressive growth targets are sustainable from here. . . .

137. An October 19, 2016 JMP Securities analyst report explained:

> ***In our view, the company did not have sufficient risk management policies in place for the underwriting of tech loans on a couple of levels. We also think the unfamiliarity of risks in tech lending also existed to some extent in other specialty lending areas***. Opus is subsequently making a change in its credit process and structure, noting that the company will bifurcate the chief credit officer role into CRE & C&I.

138. In response to the October 19, 2016 partial corrective disclosure, Opus' stock price declined precipitously, closing at $24.12 per share, ***a 12% decline*** from the opening price of $27.43, on volume of 1.3 million shares. However, Defendants still had not revealed the full impact of the charge-offs on Opus' third quarter earnings.

139. On October 24, 2016, prior to market open, Opus issued a press release announcing its third quarter earnings. The Bank announced a net loss of $3.0 million for

a $.09 loss per share, an impact per share that was four cents more than the Bank originally announced in its October 17, 2016 press release. The press release however continued to slowly leak out only part of the full truth about the depth of Opus' problems:

> As previously announced on October 17, 2016, earnings for the third quarter of 2016 were negatively impacted by charge-offs recorded on eight loan relationships that reduced the third quarter net income by $0.59 per diluted share. ***Subsequent to our October 17, 2016 press release that included an estimate of an approximate $(0.05) loss per share, management completed its analysis of the adequacy of the allowance for loan losses and increased specific reserves by $1.7 million, which increased the net loss announced on October 17, 2016 by $0.04 per share***. As previously announced, given the net loss, Opus will not be paying a dividend in connection with the third quarter. It is our intention to resume paying a dividend commensurate with our future earnings performance.
>
> ***In our Question and Answer presentation filed on October 19, 2016, we noted a previously mentioned technology loan had shown improved trends and we had received a third party valuation during the third quarter which supported the release of the specific reserve previously recorded for that loan. As management finalized its assessment process of the adequacy of the allowance for loan losses – work that was not yet completed as of October 19, 2016 – it determined to maintain a specific reserve for this loan in the amount of $1.7 million.*** This specific reserve increased our net loss for the quarter ended September 30, 2016 to $(0.09) per share from the approximate $(0.05) per share that we had previously estimated and disclosed in our press release on October 17, 2016.

140. In response to the Bank's press release, Opus' stock dropped ***20%*** from the prior day's close of $23.16, opening at $18.50 per share.

141. Also on October 24, 2016, at 2:00 p.m. GMT, Opus conducted a quarterly earnings call to discuss its first quarter 2016 financial results. During the call, Defendants addressed questions regarding the charge-offs and further explained their plans to overhaul the Bank's credit structure in response to the third quarter charge-offs but continued to fail to disclose to investors the full scope of the problems in its loan portfolio.

142. Following the earnings call, the market continued to question how Opus' credit deteriorated so quickly. An October 24, 2016 Piper Jaffray analyst report noted that it still lacked complete information from Opus in order to evaluate the true state of affairs at the Bank:

> The actual results were slightly worse than the preannouncement but we believe a lot of the bad news is in the stock. . . . We also need more color on the range of potential loss severity within criticized loans and ***why credit is seasoning this fast even outside of the Tech Banking portfolio.***

143. In response to the earnings call, Opus' stock price increased slightly from its opening price of $18.50 throughout the trading day in response to Defendants' positive statements about enhancements to the Bank's credit structure going forward. However, the overall price trend continued a downward spiral, with the stock ultimately closing at $21.29, ***8% lower*** than the prior day's closing price of $23.16.

144. The market continued to react unfavorably to Opus' disclosures. An October 25, 2016 JMP Securities analyst report noted:

> ***[W]e think the nature of the write down was discouraging given that the reserve was due to a tech loan that management had previously said had experienced improving trends and a third-party FV write-up. This change was not the only source of surprise, in our view, as*** 1) the efficiency

> ratio expanded by 430bps sequentially to 55.0%; and 2) ***management said that the ALL ratio will work towards a range of 1.35% - 1.50% over the next twelve months.*** The ALL ratio was 0.97% at quarter-end and our previous estimate had expected the reserve to expand to 1.15% at YE2017.

145. On November 9, 2016, Opus filed with the FDIC its quarterly report on Form 10-Q for the third quarter of 2016 ("3Q 2016 10-Q), signed by Gordon. The 3Q 2016 10-Q disclosed that Opus had identified a material weakness in its internal controls over financial reporting related to inadequate review of the allowance for loan losses for impaired loans, despite Defendants' representations that Opus had adequately accounted for loan losses. As explained in the 3Q 2016 10-Q, Gordon and the Bank's Chief Financial Officer ("CFO") conducted an evaluation of the Bank's internal controls and concluded:

> ***During the third quarter of 2016, management identified a material weakness in its internal controls over financial reporting. The material weakness related to inadequate review of the allowance for loan losses for impaired loans. The root cause of the material weakness relates both to risk assessment, as management did not effectively enhance the control activity when the portfolio of impaired loans changed in both quantity and credit risk profile, and control environment, as a proper response to the evolving risk would have been for management to have more experienced personnel review the allowance for loan losses for these impaired loans. Specifically, management identified a lack of knowledge of relevant regulations around the identification of charge-offs on impaired loans, ineffective review over the evaluation of specific reserves and/or charge-offs on impaired loans, and inadequate support for assumptions used in the determination of the allowance for loan losses of impaired loans.*** Following its identification of this material weakness, the Company initiated and completed a review and assessment of the impaired loans and correspondingly, the appropriateness of the allowance for loan

> losses as of September 30, 2016. The impact to the financial statements were recorded prior to the issuance of the Company's September 30, 2016 consolidated financial statements in this Quarterly Report on Form 10-Q. No restatement of prior period financial statements and no change in previously issued financial results were required as a result of this material weakness.
>
> ***Management anticipates that remediation efforts will include, and not be limited to, an enhanced risk assessment process, particularly around areas subject to rapid change, the addition of relevant and skilled resources, realignment of existing reporting structures, participation in technical trainings and updates to existing or the creation of new internal controls, processes, policies, and procedures***.

146. Following this disclosure, Opus' stock declined 1.36% on volume of 402,000 shares. This limited disclosure still did not reveal the full truth, however, because Opus' material weaknesses over financial reporting related to the inadequate review of the allowance for loan losses extended back through all of 2016, and not just the third quarter of 2016, and Opus' loan portfolio was continuing to deteriorate.

147. On January 11, 2017, Opus issued a press release announcing the resignation of Allison, effective December 31, 2016. Although Allison terminated his employment with Opus, he entered into a consulting agreement with the Bank, effective January 1, 2017.

148. On January 12, 2017, JMP Securities issued an analyst report in response to Allison's resignation, explaining:

> ***We maintain our Market Perform rating on Opus Bank after the surprise resignation of Michael Allison***, Co-President, Board Director, and President of the Commercial Bank. Allison was part of the bank's executive committee and, in our view, the second most senior officer at the bank behind Chairman, CEO, and President Stephen Gordon. . . . ***The press***

> ***release provided no information about motives for the employment separation, but we suspect Mr. Allison is likely to be held responsible for the deterioration in asset quality in the commercial bank and shortfalls in risk management processes and procedures***.

149. The full truth regarding Opus' loan portfolio finally emerged on January 30, 2017, prior to the market's open. At that time, Opus again shocked investors when it announced that its fourth quarter 2016 earnings would be impacted by further charge-offs and provisions for loan losses. The press release stated, in relevant part:

> ***Opus' fourth quarter 2016 earnings were impacted by a provision for loan losses totaling $69.5 million. The fourth quarter provision for loan losses was driven by the addition of $27.2 million for loan risk rating migration, $22.1 million for additional specific reserves on impaired loans and $19.2 million of net charge-offs recorded on impaired loans. The risk rating migration, specific reserve increases and charge-offs were concentrated in our commercial business loan portfolio, primarily in our Technology Banking, Healthcare Banking and Corporate Finance divisions.***
>
> Stephen H. Gordon, Founding Chairman, Chief Executive Officer and President of Opus Bank, stated, ***"We are deeply disappointed with the fourth quarter loss driven by credit deterioration in our commercial business loan portfolio***. We take this very seriously and are acutely focused on addressing the related issues and restoring Opus to its historic levels of performance."

150. In response to this disclosure, Opus' share price ***dropped 12% before the market opened***, to open at $23.95 per share, down from the prior trading day's closing price of $27.25 on extraordinarily high volume of nearly two million shares traded that day.

151. During the January 30, 2017 trading day, at 4:00 p.m. GMT, Opus conducted a quarterly earnings call to discuss its first quarter 2016 financial results. Gordon addressed the fourth quarter charge-offs in his prepared remarks, disclosed that the Bank planned to deemphasize healthcare practice lending, and underscored that the Bank was bolstering its credit infrastructure in response to the charge-offs:

> Our performance for the fourth quarter resulted in a net loss of $19 million, or $0.55 per share driven primarily by a provision for loan losses of $69.5 million**.** ***During the fourth quarter several of our clients in our commercial and specialty banking divisions had company-specific challenges in their underlying businesses or changes in their financial circumstances that arose during the quarter. These changes drove more risk-rating downgrades, loan impairments and additional charge-offs which resulted in higher provision expense, impacting our quarterly net income. We have taken decisive actions to bolster our credit infrastructure and to assess our commercial and specialty banking loan portfolios.***

152. Gordon further noted that the Bank would deemphasize the Healthcare Professional Practice group and would not be funding loans in that group for the "foreseeable future."

153. Brian Fitzmaurice, the Bank's new Senior EVP and CCO, disclosed that the credit problems were focused in the Commercial Banking portfolio, and that many of the loans were "enterprise value loans":

> ***During the fourth quarter we saw rapid deterioration in the financial performance of a group of commercial business loans that led to risk-rating downgrades, loan impairments and loan charge-offs. This occurred in both previously identified and new problem loans. Deterioration was largely seen within our specialty commercial banking divisions, specifically technology banking, healthcare banking, and corporate finance, and was concentrated in loans that had been underwritten based on projected cash flow or enterprise***

> ***value of the underlying business. I'll refer to these as enterprise value loans***. The purpose of many of these loans was to provide financing or refinancing of a loan or loans used to purchase a business or assets, fund a dividend, or working capital loans for technology companies which had not yet achieved consistent positive operating cash flow. In many cases these loans contained risks associated with the execution of the business plan necessary to achieve projected cash flows to service the debt. ***We have suspended new originations of these types of loans for the foreseeable future***. ***As of December 31, 2016, there were approximately $915 million of enterprise value loans outstanding, excluding our institutional syndication loans.*** The risk-rating change, impairments and charge-offs that occurred in the fourth quarter were driven by company-specific challenges in their underlying businesses, changes in financial circumstances, or both.

154. Later in the call, Fitzmaurice explained that of the $915 million of enterprise value loans, 2% were special mention and 17% were classified. Fitzmaurice also had the following exchange with an analyst during the call:

> **Q:** And then, Brian, did you say that – are you guys going to continue to fund using that [enterprise value] kind of evaluation process or is that something that's going to be discontinued? I want to make sure I get that exactly right.
>
> **A:** Yes, ***we've suspended the activity. These EV [Enterprise Value] loans, there's a broad spectrum of risk***. Right now we've played on the lower EBITDA. So, we clearly are eliminating that. I think most banks have an appetite for higher EBITDA companies where there's a lot less execution risk. We will likely go back into the space in a measured and moderate way once we determine exactly what our desire is for that. There is a place for it in moderation.

155. Finally, Fitzmaurice admitted in an exchange with an analyst that the driver of loan losses was Opus' product, and not a "macro" event:

> **Q:** Add then based on what you described as the process of review, you guys said that there was significant deterioration in certain loans during the quarter. ***Is this something that is triggered by a macro event or something? How did the deterioration occur in the fourth quarter? Or was it something that was inherent in the loan that was discovered through the process of evaluation?***
>
> **A:** It was generally, I was reviewing loans with the data, the files were comprehensive and up-to-date. So, I looked at the data at hand. Again, it runs to the product. These are smaller EBITDA companies that can be significantly impacted with a modest event. In some cases it was the resolution of litigation, it was the loss of a client, a change in business model that impacted revenue.
>
> ***Those are pretty much the drivers. I think, again, it's more the product than a macro event. It's the fact that these companies were smaller with less capital to absorb an issue.***

156. Analysts following the Bank were stunned by Opus' announcement of additional charge-offs and continued credit deterioration over the fourth quarter of 2016. A January 30, 2017 JMP Securities analyst report stated, ***"Our bear case thesis for 4Q16 occurred as credit was much worse than expected, causing the necessity to raise common equity."*** A Sandler O'Neill + Partners analyst report explained, ***"Reported loss reflects major credit review . . . . Fourth quarter results reflected several actions by the company to shore up its underwriting and credit management practices and regain a handle on the credit quality of its commercial banking loan portfolio."***

157. A January 30, 2017 Piper Jaffray analyst report focused on the Bank's disclosure that enterprise value loans were largely to blame for credit issues, noting:

> Enterprise Value Loans Are a Major Source of the Problems. We ***now*** understand "enterprise value" loans account for

> $915M or 16% of total loans outstanding with $225M or 25% of the portfolio in criticized ($158M) and nonaccrual ($67M). These loans are to smaller companies based on projected cash flows. Our revised loan growth forecast of 9% in 2017 and 2018 (from 12%) assumes this portfolio runs-off.

158. In response to the press release and earnings call, Opus' share price continued to decline throughout the trading day, ***closing at $20.40, a 14.8% decline from the day's opening price of $23.95 and a 25% decline from the prior day's closing price of $27.25*** on volume of 1.9 million shares.

**G. <u>Post Class Period Developments</u>**

159. On March 13, 2017, Opus filed its annual report on Form 10-K for full fiscal year 2016 ("2016 10-K"), signed by Gordon. The 2016 10-K admitted that at least throughout 2016 Opus had material weaknesses in reporting related to the Bank's credit review function and its review of allowance for loan losses for impaired loans and an inadequate scope of the internal Credit Review function. The 2016 10-K states:

> ***The material weakness relates to inadequate review of the allowance for loan losses for impaired loans and inadequate scope of the internal Credit Review function. The root cause of the material weakness relates both to risk assessment and control environment. With respect to risk assessment, management did not effectively enhance its review of impaired loans as they increased in both quantity and credit risk, while internal Credit Review did not sufficiently adjust the nature and extent of its credit review plan as credit quality in the loan portfolio began deteriorating.*** With respect to control environment, the Company did not have sufficiently qualified personnel reviewing impaired loans. Specifically, management identified that there was inadequate knowledge of relevant regulations around the identification of charge-offs on impaired loans, ineffective review over the evaluation of specific reserves and/or charge-offs on impaired loans, and inadequate support for assumptions used in the determination of the allowance for loan losses on impaired loans. ***Further,***

> ***the internal Credit Review function did not have a process in place to make timely changes to their review scope and procedures as credit quality began to deteriorate.***
>
> The Company has concluded that in 2016 this deficiency could have resulted in a material misstatement of the consolidated financial statements that would not have been prevented or detected on a timely basis, and as such, this control deficiency results in a material weakness.
>
> The material weakness did not result in any material misstatement of the Company's financial statements and disclosures for the year ended December 31, 2016.
>
> Management believes it has made significant progress toward remediation of the underlying root causes of the material weakness, having taken a number of actions to remediate the material weakness. Among other things we have:
>
> - ***Enhanced the risk assessment process***, particularly around areas subject to rapid change;
> - Added relevant and skilled resources which included the hiring of a ***new Senior Executive Vice President Chief Credit Officer in December 2016, senior credit administrators, and a new Head of Credit Review in January 2017***;
> - ***Realigned existing reporting structures in credit, risk management, and loan originations***;
> - Participated in technical trainings; and
> - ***Enhanced existing and created new internal controls, processes, policies, and procedures.***

160. Opus' stock price has yet to recover from the Bank's surprise announcements regarding the true quality of its loan portfolio and the true nature of its credit controls and underwriting standards. As of April 21, 2017, Opus' stock price

closed at $20.80 and continues to trade around $20 per share, well below Opus' IPO price of $30.

## V. ADDITIONAL SCIENTER ALLEGATIONS

161. As detailed above, Defendants acted with scienter during the Class Period because they knew or recklessly disregarded that the statements regarding Opus' conservative credit culture, stringent underwriting, and robust credit monitoring systems were false and misleading. In reality, Opus' credit culture was aggressive and not conservative; Opus' credit controls, including the Bank's purported credit monitoring, were either disregarded or ineffective at identifying problem loans; Opus extended risky loans during the Class Period to entities with little to no cash flows or EBITDA; and Opus extended hundreds of millions of dollars of enterprise value loans during the Class Period. As detailed above, Defendants knew their statements were false and misleading because they could easily access CreditQuest and generate the risk rating report for all loans in the portfolio. Further, Defendants received numerous reports indicating the true risk and quality of the Bank's loan portfolio, including monthly monitoring reports received by all Defendants, and PLRs received by Allison. The Bank also held quarterly credit review meetings to discuss problem loans, conducted semi-annual stress tests on the entire loan portfolio, conducted regular reviews of its loan portfolio to monitor compliance with loan covenants and to determine appropriate loan risk rating; and actively monitored loans that management believed indicated additional potential credit risk. Finally, Gordon pressured employees to close loans regardless of risk, often made the final determination on terms and pricing of loans, and on at least one occasion had a one-on-one meeting to discuss a problem loan in the Healthcare Banking unit with CW2.

162. Defendants' scienter is further demonstrated by the fact that (1) Allison sold nearly a third of his Opus holdings in two insider sales during the Class Period; (2) the Bank used Opus common stock in two acquisitions during the Class Period, and (3)

Allison had extensive credit experience and either knew or recklessly disregarded the true credit quality of Opus' loan portfolio. Moreover, the scienter of the Bank is adequately pled in light of the scienter of the Bank's senior executives.

**A. <u>Allison's Insider Trading During the Class Period Is Indicative of Scienter</u>**

163. Insider trading by Allison during the Class Period further indicates his scienter. Allison sold a total of 9,975 shares of Opus in two transactions during the Class Period, for gross proceeds of over $340,000. Prior to these trades, Allison had never sold Opus stock on the open market. Neither of these trades was made pursuant to a 10b5-1 plan, and the trades were made while Allison was in possession of material adverse non-public information regarding the true credit quality of Opus' loan portfolio.

164. On March 17, 2016, Allison sold 5,500 shares of Opus common stock, or 6.4% of his total holdings at that time, for net proceeds of $188,100. At the time of the sale, Allison had access to material non-public information relating to the deteriorating credit quality of Opus' loan portfolio through his receipt of PLRs, monthly loan trend cards, and monthly loan monitoring reports.

165. On September 1, 2016, Allison sold 4,475 shares of Opus common stock, or 6.01% of his total holdings at that time, for net proceeds of $154,163. This sale occurred just prior to the Bank disclosing massive charge-offs and downgrades in its loan portfolio. At the time of the sale, Defendant Allison had access to material non-public information relating to the deteriorating credit quality of Opus' loan portfolio through his receipt of PLRs, monthly loan trend cards, and monthly loan monitoring reports.

**B. <u>The Use of Opus Common Stock as Currency in Two Acquisitions During the Class Period Is Indicative of Scienter</u>**

166. During the Class Period, Defendants took advantage of Opus' inflated stock price by using Opus common stock as currency to acquire other companies. These

transactions provide additional strong evidence of scienter, as they demonstrate Defendants' motive to inflate Opus' stock price during the Class Period.

167. On April 1, 2015, Opus announced it completed its acquisition of Commerce Escrow Company ("CEC"), a Los Angeles-based escrow company focused on commercial business and commercial real estate transactions, and RPM Investments ("RPM"), Inc., an accommodator for tax-deferred commercial exchanges. As consideration for the acquisition, CEC and RPM shareholders received, in aggregate, $11.25 million in cash and 449,273 shares of Opus common stock worth approximately $13.75 million.

168. On April 14, 2016, Opus announced it completed its acquisition of PENSCO Services, LLC and its wholly-owned subsidiary PENSCO Trust Company (collectively "PENSCO"), a leading "tech-enabled alternative asset IRA custodian." As consideration for the acquisition, PENSCO shareholders received 1,664,615 shares of Opus common stock and approximately $46.4 million in cash.

169. Defendants' use of Opus common stock during the CEC/RPM and PENSCO acquisitions ensured that Opus could continue its rapid growth story and is further indicative of Defendants' scienter.

### C. <u>Gordon's and Allison's Prior Experience in the Banking Industry Is Indicative of Scienter</u>

170. Gordon had extensive banking and lending experience prior to joining Opus, as described in paragraphs 18 and 19 above, and therefore either knew or recklessly disregarded that Opus' credit culture was aggressive and not conservative, that Opus' underwriting was not disciplined or stringent, and that the Bank was inadequately reserving for loan losses. Given Gordon's prior banking experience, the reports provided to him on a regular basis during the Class Period, including monthly loan monitoring reports, and his constant pressuring of employees to close loans at any cost, it

is implausible that he was unaware of the Bank's risky underwriting and the declining credit quality of Opus' loan portfolio during the Class Period.

171. Allison had extensive credit experience prior to joining Opus, as described in paragraph 20 above, and therefore either knew or recklessly disregarded that Opus' credit culture was aggressive and not conservative, that Opus' underwriting was not disciplined or stringent, and that the Bank was inadequately reserving for loan losses. Given Allison's prior credit experience and the reports provided to him on a regular basis during the Class Period, including PLRs, monthly loan trend cards, and monthly loan monitoring reports, it is implausible that he was unaware of the Bank's risky underwriting and declining credit quality of Opus' loan portfolio during the Class Period.

## VI. LOSS CAUSATION

172. During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated and/or maintained the price of Opus common stock and operated as a fraud or deceit on Class Period purchasers of Opus common stock by failing to disclose and misrepresenting the adverse facts detailed herein. As Defendants' prior misrepresentations and fraudulent conduct were disclosed through a series of partial corrective disclosures and became apparent to the market, the price of Opus common stock declined significantly as the prior artificial inflation came out of the Bank's common stock price.

173. As a result of their purchases of Opus common stock during the Class Period, Lead Plaintiff and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.

174. By concealing from investors the adverse facts detailed herein, Defendants presented a misleading picture of the health of Opus' business and loan portfolio, including the creditworthiness of the loans, the credit structures in place at the Bank, and the Bank's accounting practices. When the truth about the Bank was

revealed to the market through a series of partial corrective disclosures, the price of Opus common stock fell significantly. This decline removed the inflation from the price of Opus common stock, causing real economic loss to investors who had purchased Opus common stock during the Class Period.

175. The economic loss, *i.e.*, damages, suffered by Lead Plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate and/or maintain the price of Opus common stock and the subsequent significant decline in the value of Opus common stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

## VII. APPLICABILITY OF PRESUMPTION OF RELIANCE – FRAUD ON THE MARKET DOCTRINE

176. Lead Plaintiff is entitled to a presumption of reliance on Defendants' material misrepresentations and omissions pursuant to the fraud-on-the-market doctrine because, at all relevant times, the market for Opus common stock was an efficient market for the following reasons, among others:

a. Opus common stock met the requirements for listing, and was listed and actively traded, on the NASDAQ, a highly efficient, electronic stock market;

b. as a regulated issuer, Opus filed periodic public reports with the FDIC and the NASDAQ;

c. Opus regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

d. Opus was followed by securities analysts employed by major brokerage firms, including Sandler O'Neil + Partners, J.P. Morgan, Piper Jaffray, JMP Securities, and Credit Suisse who wrote reports which were distributed to the sales force and certain customers of

> their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

177. In the alternative, Lead Plaintiff is entitled to a presumption of reliance under *Affiliated Ute v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are primarily predicated upon the omission of material facts that Defendants had a duty to disclose, namely, that Opus' credit culture was aggressive (and not conservative), that Opus' credit controls, including the Bank's purported credit monitoring, were disregarded or ineffective at identifying problems loans, and that Opus was extending risky loans, including enterprise value loans, during the Class Period.

178. As a result of the foregoing, the market for Opus common stock promptly digested current information regarding Opus from all publicly available sources and reflected such information in the prices of the common stock. Under these circumstances, all purchasers of Opus common stock during the Class Period suffered similar injury through their purchase of Opus common stock at artificially inflated prices and a presumption of reliance applies.

## VIII. <u>NO SAFE HARBOR</u>

179. The statutory safe harbor applicable to forward-looking statements under certain circumstances does not apply to any of the false and misleading statements plead in this Complaint.

180. Either the statements complained of herein were not forward-looking statements, but rather were historical statements or statements of purportedly current facts and conditions at the time the statements were made, or to the extent there were any forward-looking statements, Opus' verbal "Safe Harbor" warnings accompanying its oral forward-looking statements issued during the Class Period were ineffective to shield those statements from liability.

181. Further, the statutory safe harbor does not apply to statements included in financial statements that purportedly were made in accordance with GAAP, such as Opus' Forms 10-K and 10-Q issued throughout the Class Period.

182. To the extent that any of the false and misleading statements alleged herein can be construed as forward-looking, those statements were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements.

183. To the extent that any of the false and misleading statements alleged herein can be construed as forward-looking, Defendants are liable for those false or misleading statements because, at the time each such statement was made, the speaker knew the forward-looking statement was false or misleading and the forward-looking statement was authorized and/or approved by an executive officer of Opus who knew that the forward-looking statement was false. None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to, or stated to be dependent on, those historic or present tense statements when made.

## IX. CLASS ACTION ALLEGATIONS

184. Lead Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all those who purchased the common stock of Opus between July 28, 2014 and January 30, 2017, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants and their families; the officers and directors of the Bank, at all relevant times; members of their immediate families; and their legal representatives, heirs,

successors or assigns and any entity in which Defendants have or had a controlling interest.

185. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Opus common stock was actively traded on the NASDAQ. While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Opus or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

186. Lead Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law complained of herein.

187. Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and securities litigation.

188. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a. whether the federal securities laws were violated by Defendants' acts as alleged herein;

b. whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and operations of Opus;

c. whether the price of Opus common stock was artificially inflated and/or maintained during the Class Period; and

d. to what extent the members of the Class have sustained damages and the proper measure of damages.

189. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## X. COUNTS

### COUNT I
### FOR VIOLATION OF SECTION 10(B) OF THE EXCHANGE ACT AND RULE 10B-5 AGAINST ALL DEFENDANTS

190. Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

191. During the Class Period, Defendants disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

192. Defendants:

(a) employed devices, schemes, and artifices to defraud;

(b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and

> (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock during the Class Period.

193. Lead Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Opus common stock. Lead Plaintiff and the Class would not have purchased Opus common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

194. As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their purchases of Opus common stock during the Class Period.

**<u>COUNT II</u>**
**FOR VIOLATION OF SECTION 20(A) OF THE EXCHANGE ACT AGAINST THE INDIVIDUAL DEFENDANTS**

195. Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

196. The Individual Defendants acted as controlling persons of Opus within the meaning of Section 20(a) of the Exchange Act as alleged herein. By reason of their positions as officers and/or directors of Opus, and their ownership of Opus stock, and their culpable participation, as alleged above, the Individual Defendants had the power and authority to cause Opus to engage in the wrongful conduct complained of herein.

197. By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## XI. PRAYER FOR RELIEF

198. WHEREFORE, Lead Plaintiff prays for judgment as follows:

a. declaring this action to be a proper class action pursuant to Federal Rule of Civil Procedure 23;

b. awarding compensatory damages in favor of Lead Plaintiff and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

c. awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

d. such equitable/injunctive or other relief as deemed appropriate by the Court.

## XII. JURY TRIAL DEMANDED

199. Lead Plaintiff demands a trial by jury.

Dated: April 24, 2017

Respectfully submitted,

**GLANCY PRONGAY & MURRAY LLP**

By: */s/ Robert V. Prongay*

Lionel Z. Glancy
Robert V. Prongay
Lesley F. Portnoy
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Tel.: (310) 201-9150
Fax: (301) 201-9160
Email: lglancy@glancylaw.com
rprongay@glancylaw.com
lportnoy@glancylaw.com

***Liaison Counsel for Lead Plaintiff and the Class***

Steven J. Toll
Daniel S. Sommers
S. Douglas Bunch
Elizabeth Aniskevich
**COHEN MILSTEIN SELLERS & TOLL PLLC**
1100 New York Avenue, N.W.
East Tower, Suite 500
Washington, DC 20005
Tel.: (202) 408-4600
Fax: (202) 408-4699

***Lead Counsel for Lead Plaintiff and the Class***

**PROOF OF SERVICE BY ELECTRONIC POSTING**

I, the undersigned say:

I am not a party to the above case, and am over eighteen years old. On April 24, 2017, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the Central District of California, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on April 24, 2017, at Los Angeles, California.

*s/ Robert V. Prongay*
Robert V. Prongay

# Mailing Information for a Case 2:16-cv-07991-AB-JPR Nancy Schwartz v. Opus Bank et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Elizabeth A Aniskevich**
  eaniskevich@cohenmilstein.com
- **Stephen Douglas Bunch**
  dbunch@cohenmilstein.com,efilings@cohenmilstein.com
- **Jeffrey Michael Cohon**
  jcohon@cohonpollak.com,hpollak@cohonpollak.com
- **Lionel Zevi Glancy**
  lglancy@glancylaw.com
- **Frank J Johnson**
  frankj@johnsonandweaver.com,paralegal@johnsonandweaver.com,shawnf@johnsonandweaver.com,michaelf@johnsonandweaver.com,ceciliar@johnsonandweaver.com
- **Eric A Kuwana**
  eric.kuwana@kattenlaw.com,bill.mcgonigle@kattenlaw.com,kelsey.matusak@kattenlaw.com,alexandra.rafajko@kattenlaw.com,meghan.evans@kattenlaw.com
- **Charles Henry Linehan**
  clinehan@glancylaw.com
- **Michael J Lohnes**
  michael.lohnes@kattenlaw.com,rosie.gradilla@kattenlaw.com,kelsey.matusak@kattenlaw.com,ecfdocket@kattenlaw.com,meghan.evans@kattenlaw.com
- **Howard A Pollak**
  hpollak@cohonpollak.com
- **Lesley F Portnoy**
  LPortnoy@glancylaw.com,eaniskevich@cohenmilstein.com,jreiser@cohenmilstein.com,SToll@cohenmilstein.com,efilings@cohenmilstein.com,dsommers@cohenmilstein.com
- **Robert Vincent Prongay**
  rprongay@glancylaw.com,CLinehan@glancylaw.com,info@glancylaw.com,echang@glancylaw.com,bmurray@glancylaw.com
- **Daniel S Sommers**
  dsommers@cohenmilstein.com,efilings@cohenmilstein.com
- **Steven J Toll**
  stoll@cohenmilstein.com
- **Phong L Tran**
  phongt@johnsonandweaver.com,paralegal@johnsonandweaver.com
- **Bruce G Vanyo**
  bruce@kattenlaw.com,kelsey.matusak@kattenlaw.com,sandy.broff@kattenlaw.com,ecf.lax.docket@kattenlaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)